Stuart's LLC and WAYNE GALVIN, Plaintiffs,

against
Stuart Edelman, LEVEL 8 APPAREL, LLC, WORLD CROSS CULTURE, INC., WORLDWIDE SOURCING GROUP, LLC, SEUNG BON KIM a/k/a SCOTT KIM a/k/a SAM KIM, PETER LISTER, MICHAEL HONG and MARY-LEE EDELMAN, Defendants.


012560-09

Attorney for the Plaintiff:
Dennis M. Perlberg, Esq.
Speyer & Perlberg, LLP
115 Broadhollow Rd. Suite 250
Melville, NY 11747
(631) 673-6670
Attorney for Defendant Level 8 Apparel,
World Cross Culture and Kim:
Paul Levinson, Esq.
McLaughlin & Stern, LLP
260 Madison Ave.
New York, NY 10016
(212) 448-6279
Attorney for Defendant Michael Hong:
Rudy A. Dermesropian, Esq.
Rudy A. Dermesropian, LLC
45 Broadway, Suite 1420
New York, NY 10006 (646) 586-9030
Attorney for Defendants Peter Lister and WSG:
Anthony W. Cummings, Esq.
Certilman Balin Adler & Hyman, LLP
90 Merrick Ave, 9th Fl
East Meadow, NY 11554
(516) 296-7000
Stuart Edelman: Pro Se


Vito M. DeStefano, J.

In this action to recover damages for, inter alia, breach of fiduciary duty and interference with contractual relations, the Plaintiffs claim that the Defendants colluded in the diversion of assets and business from the Plaintiff, Stuart's LLC ("Stuart's") to Defendant Level 8 Apparel, LLC ("Level 8"). Defendants Peter Lister and World Cross Culture, Inc. ("World Cross" or "WCC") assert counterclaims and cross claims for, inter alia, breach of a promissory note and breach of contract, etc.
Stuart's, a domestic limited liability company, was formed in December 2003 and owned by Plaintiff, Wayne Galvin ("Galvin") and Defendant, Stuart Edelman ("Edelman"). Galvin was the managing member and 81% equity owner of Stuart's and Edelman was a 19% equity owner of Stuart's. Stuart's was in the business of production, sale, and distribution of clothing and apparel. Defendant Worldwide Sourcing Group, LLC ("WSG"), which is owned and operated by Defendant Peter Lister, was Stuart's financier; World Cross, owned and operated by Defendant Seung Bong Kim a/k/a Scott Kim a/k/a Sam Kim ("Kim"), was Stuart's manufacturer; and Defendant Michael Hong ("Hong") was Stuart's clothing designer. Defendant Mary-Lee Edelman is the wife of Stuart Edelman. The Plaintiffs' claims against her were settled.
A trial in this matter commenced on June 24, 2015, and continuing on June 24, 25, 26, 30; July 1, 8, 9, 10, 13, 14, 15; August 5, 11, 12, 13; and September 1, 2015, at which the following witnesses testified: Wayne Galvin, Stuart Edelman, Peter Lister, Michael Hong, Missy Moon, Sam Kim and Frank Spadaro; Howard Fielstein and Samuel Kursh testified as expert witnesses. For almost a year after the conclusion of trial, post-trial settlement discussions took place, which ultimately were unsuccessful.
The following is a summary of the testimony and evidence elicited at trial.
Testimony of Wayne Galvin
In 1974, Galvin entered the garment industry as a trainee at Evil Clothes. Later, he worked at Gordon & Ferguson, where he met Hong and Edelman. Galvin worked at Gordon & Ferguson until December 2002.
In 2003, Galvin and Edelman discussed starting a company to "trade on better leather and cloth outerwear." Edelman filed organizational papers for Stuart's on December 8, 2003. On May 13, 2004, an Operating Agreement was signed with an initial capital contribution of $10,000 [*2]made by Galvin and Edelman each. The agreement indicated that Galvin, the greater financial contributor would have an 81% membership interest and that Edelman would have 19%. It was also agreed that the "cash draw" was to be split equally (pp 87 -94).
Stuart's, executed a promissory note on December 29, 2005 to pay Galvin for loans he would be making to Stuart's to fund the business. The funds were obtained by Galvin from a home equity line of credit on his home. Stuart's paid the interest on the home equity loan for a period but ceased making payments in February 2009, leaving an unpaid principal of $265,000 (pp 97 - 100).
In July 2005, Hana Financial ("Hana") became the financing/lending factor for Stuart's, providing funding for the purchase of merchandise and operating expenses. At the same time, Galvin signed a personal guarantee in favor of Hana (pp 101- 104).
In 2006, after Galvin and Edelman had meetings with Alan Krantzler, the director of licensing and senior vice president of Tumi, Inc., they were asked to assemble a clothing line for the "fall 2007 launch." As a result, Galvin and Edelman manufactured samples, obtained additional office space and hired a dedicated brand manager and a designer (Defendant Michael Hong) (pp 109 - 112).
Galvin testified that Michael Hong became an employee of Stuart's on May 14, 2007 at which time he required him to sign a nondisclosure agreement as Hong would be privy to confidential and proprietary information concerning Stuart's, and specifically "information, knowledge or data consisting of the following but not limited to processes, know-hows, designs, drawings, diagrams, formula, test data, accounting or financial data, pricing or salary data, marketing data, business plans, strategies and negotiations." He added, "when it comes to designs, you are talking about the drawings of the designs we were going to be contemplating using for different lines, trim details that we would be using marketing strategies, that we would be using to promote the line, fabrications, business plans and strategies, negotiations and contracts with suppliers." Galvin stated that Edelman and Lister did see this agreement but it was not shared with Kim or Tumi (pp 313 - 319).
In November 2006, Stuart's was told that it had been awarded a license for Tumi. However, on January 1, 2007, Tumi hired a creative director David Chu who was the founder of Nautica Sportswear. Galvin testified that Chu "nullified the entire presentation that was done for a fall 2007 launch, wanted contracts to be stipulated in a certain way for the licensing agreement which pushed out the launch date one year" (pp 105 - 107).
In 2007, Stuart's received a Tumi "license", which extended through June 30, 2011. Galvin testified that it was his understanding that this was an exclusive contract and Stuart's would be the only company authorized to make outerwear for Tumi during this contract period. The licensing agreement contained the following provision regarding default: "the defaulting party shall have the right to cure such event of default for a period of 30 days after receipt of a written notice of default from the non-defaulting party" (pp 112- 116).
Galvin testified to the financial assistance they received from Hana in 2007, and indicated that Hana was "supporting us with the financing. And then I would say in approximately March, they contacted us and said that they were no longer going to fund the operating expenses." Due to the need for funding, Jean Schneider, Galvin's mother-in-law, loaned $50,000; his son, Jason Galvin, loaned $26,000, and Galvin loaned an additional $25,000, to Stuart's (pp 122-126).
In July 2007, Galvin and Edelman were introduced to Peter Lister ("Lister") by a manufacturer who knew that Stuart's was seeking financing and that Lister was interested in financing an apparel company. Negotiations between Lister and Stuart's occurred through 2007. Prior to finalizing the agreement, Lister provided funding from his personal checking account to the staff in the amount of $50,000. Galvin testified that in November of 2007 Stuart's was having trouble meeting payroll expenses. On November 8, 2007, Lister sent him an email with copies to others stating, "I have agreed to loan approximately $50,000 total to several individuals owed payment for salary by Stuart's. This is a personal loan to be repaid when Stuart's or Nuco is funded and can enter these amounts on their records." Yet Galvin testified that in a prior private meeting, Lister told him personally "he wanted to contribute and give the company $50,000 to cover payroll out of his personal account, and if he lost that, it was no big deal."(pp 359 - 369). On May 20, 2008, an agreement was signed with Lister's company, WSG, to provide funding to Stuart's. Galvin testified that WSG, "was set up as an arm length's funding company for Stuart's, LLC as Peter Lister did not want to have any attachment to the loan that was outstanding from Hana Financial" (pp 127 -130).
Galvin testified that in November of 2007 Stuart's was having trouble meeting payroll expenses. On November 8, 2007, Lister sent him an email with copies to others stating, "I have agreed to loan approximately $50,000 total to several individuals owed payment for salary by Stuart's. This is a personal loan to be repaid when Stuart's or Nuco is funded and can enter these amounts on their records." Yet Galvin testified that in a prior private meeting, Lister told him personally "he wanted to contribute and give the company $50,000 to cover payroll out of his personal account, and if he lost that, it was no big deal" (pp 359 - 369).
WSG agreed to make loans to Stuart's pursuant to the loan agreement and, in addition, WSG agreed to manufacture and supply to Stuart's merchandise as ordered by Stuart's from WSG. Galvin explained that WSG was to pay the factor and purchase the merchandise that Stuart's ordered and pay the costs for the merchandise to be shipped to the Stuart's warehouse. WSG would be compensated through profits. The agreement with WSG also stated: "[p]rovided that WSG has made aggregate loans to Stuart's of at least $900,000 in accordance with the loan agreement, Stuart's shall pay WSG an amount equal to 33 and one-third percent of the amount of the distributed cash . . . the profit." Under the agreement, "upon payment of all obligations due and owing by Stuart's to Hana, and to all other creditors to Stuart's of December 31, 2007, WSG shall be admitted as a member of Stuart's with the same designations and rights as Wayne Galvin and Stuart Edelman." When asked the reason for this provision, he stated, "[Lister] did not want to be a member of Stuart's, LLC because of our debt to Hana Financial" (pp 132-134).
On April 1, 2007, Stuart's entered into a Master Sourcing Agreement with Aeropostale, Inc. to become a vendor for the Aeropostale line. Galvin explained that it takes several years to be able to develop the product, increase the business, and then execute a Master Sourcing Agreement (pp 135 - 137).
At the end of 2007, Galvin met Sam Kim, owner of World Cross and formed a relationship with his company to become the manufacturer's agent. Galvin said that, "[Kim] would have the facilities in Asia to be able to manufacture the products according to the specifications of the retailer at an advantageous price for a competitive price against other manufacturers that were buying through the same program." World Cross produced the "tech [*3]packs" according to Aeropostale's specifications and designs. World Cross was to finance the product through their factor, Capstone, and was to pay the cost of manufacturing and the expenses on a landed duty paid basis, shipped directly to the customer, instead of going through Stuart's (warehouse facility and back office). Galvin stated that Stuart's agreed to accept 8.3 percent of the profit of the Aeropostale sales that World Cross was manufacturing (pp 135 -142).
On the evening of February 28, 2009, Galvin and family members went into the Stuart's office and discovered several documents. In the first document—an e-mail dated December 10, 2008, Edelman wrote to Lister, "Peter, as you are very much aware, there are several critical issues at Stuart's. The problems are centered on Wayne's lack of contribution and negativity. His presence has been disruptive and threatens to dismantle everything that our staff has worked so hard to establish" (pp 147 -148). In the same email, he continues "[t]o reach this point, I have had to equate my personal loyalty and gratitude to Wayne, as well as the black and white reality of growing a successful business in the current economic climate, not an easy process. . . . The company is poised to create a market, produce and sell impressive volume to both TUMI and Aeropostale for 2009. If I can relieve the stress of Wayne's presence, I feel confident that I will renew my focus and confidence in leading this company to the next phase of development" (p 149). In the third paragraph he states: "[a]lthough I have listened to my staff, Sam and you on these recurring issues with Wayne, it has taken till this very moment to recognize that a buyout arrangement must be offered and executed immediately." The e-mail mentions $400,000 as a buyout price, although Galvin said he never was offered that amount (p 150).
In another email from Edelman to his wife Mimi, Edelman writes "I've spoken to Sam [Kim] as he is here in the office almost every day when he is in New York, and he also can see that Wayne has a negative impact on the business. . . . Sam has other customers and he is not a stupid man. He sees our potential which will be to his benefit too. Sam directly said to me in his rough Korean that I should get rid of Wayne, but what he really means is that the changes we need to take care of are more than just that to compete in the market." Galvin testified that Edelman never told him that he had a negative impact on the business or that Kim said that he "should get rid of him" (p 157).
Another document found by Galvin, dated December 10, 2008, from Edelman to Lister, reads "Aeropostale gave us quantities and prices for the fall and back to school buy today, early delivery. It totals $2 million up from $300,000 last year." Galvin said he had never received a copy of this email and had not been told about the $2 million order. In an email from Lister to Edelman dated December 15, 2008, Lister writes "regarding Tumi label and Tumi sport, if that is as viable as we are hoping, it should not be too difficult when and if the issue comes up to take that license agreement into another LLC from Stuart's. It could be Worldwide or a new one. It might make the Wayne issue easier and safer. And most of all, it would take a potential profit away from Stuart's creditors, whoever they are or will be." In a response to this email, Edelman writes "I like the idea about Tumi out of Stuart's."
Galvin testified that he had not been consulted in December 2008, as the managing member and 81 percent owner of Stuart's about whether Tumi should be removed from Stuart's. And, as a creditor of Stuart's, removing Tumi from Stuart's would have been a disadvantage to him personally (pp 158 - 160).
In an email dated January 10, 2009, Galvin wrote to Edelman, "we need to make contact [*4]with people to find out if they would be interested in taking over the company. We have intellectual property of Tumi with a strong private label business although at low margins." In reference to Julian Geiger, CEO of Aeropostale, the email continues, "[i]f Julian doesn't override the huge chargeback, I can't imagine Sam doing the same deal for "09 or lend you money on a collateral letter of guarantee."[FN1]
In response to this email, Galvin and Edelman had a meeting in which they went through a list of people to contact "to see if they would be interested in a merger or taking over the company because we had the valuable Tumi license. There were a number of companies that were buying or trying to get that license" (pp 162 -165).
In another email dated January 12, 2009, Edelman wrote to Lister, that he had met with Geiger, saying that "it is very difficult for us to continue doing business if we change from Stuart's to another company. If we do file under Stuart's it is due to the fact that more than 50 percent of our volume is with Aeropostale and as a public company, they will report this." He goes on to say that "Geiger suggests that somehow we find a way to continue under Stuart's. [Geiger] is certain that we will double our business this year and they are planning to visit the factories that Sam is producing our goods. . . . I know we had a plan, but with the next few days' appointments we have no choice but to bite our tongue and continue as is with Wayne. He is working hard to get the inventory sold at as much profit as possible * * * we had more or less a plan of action and we aren't moving an inch forward. If we don't change anything we can't do a thing for the balance of the year without risking every creditor to say we sold, design, plan, the whole season as Stuart's and they have the right to take the profit no matter who the company that ships it is" (pp 162 - 168).
Galvin testified that on January 2, 2009, Edelman offered him an "extensive exit proposal" and he responded by asking for up-front payment of $450,000, 20% share of Stuart's, and to be removed from the obligations to Hana, TD Bank overdraft, auto leases, and Merchant Factors (pp 170 - 171).
Although Level 8 was formed on February 11, 2009, Galvin didn't know that "there was a Level 8 in planning before this date. He did not know of the existence of Level 8 until February 28, 2009 when he discovered the documents in Stuart's office (pp 171 - 172).
Galvin was shown an order from the Corporate Marketplace, which is an American Express catalog, dated February 19, 2009 and explained that Stuart's had worked with the president of the corporate reward's catalog to inventory items of apparel that are in the catalog for fulfillment of orders placed by a customer using their corporate rewards. In this regard, Galvin identified the order number as a "Stuart's pack away style number" which was T-Tech Tumi items. However, in the same order, the supplier was listed as Level 8. When asked how this was possible, Galvin responded that "[s]omeone got to the Corporate Marketplace and asked them to change the name from Stuart's to Level 8" (pp 175 -181).
On February 25, 2009, Galvin reviewed three separate emails, which had all been sent the evening before. The emails were from three Stuart's employees, KK Park who worked in production, Michael Hong, and Jennifer Berone, indicating they were resigning from Stuart's. 
During testimony, Galvin was asked questions concerning a document entitled, "Daily Balance Level 8." The document indicated that there was a deposit of $30,000 from Peter Lister and $30,000 from WCC. It indicated payments to Stuart Edelman for $2,000, two payments to Mary-Lee Edelman for $2,000, Michael Hong for $2,827.27, KK Park for $1,249. There was also a payment to Lorraine Bittner who was Stuart's bookkeeper and a lease payment for Edelman's car. Galvin testified that he did not have knowledge of these payments until discovering the document. There was also an email from Edelman to KK Park, Michael Hong, Jennifer Barone, Galvin and Lorraine Bittner, in which Edelman wrote, "I will do my best to get your back-pay for the days you all worked as soon as possible." Galvin testified that none of these employees ever approached him about their back-pay after this date and that they went to work for Level 8 immediately after leaving Stuart's (pp 185 - 205).
An email dated February 27, 2009 from Lister to Edelman, and copied to Hong and Missy Moon reads, "[t]his is mainly for Stuart. Certainly for Michael and definitely for Sam since we are all associated and I think emails meant for one should concern all three of us. . . . Stuart/Michael we discussed briefly at the car who needs to be contacted and by whom so that the stores no longer call Wayne regarding orders; Nordstrom's, Barney's, Sachs, L & T [Lord and Taylor], et cetera."[FN2]
Lister continues, "[f]ollow up with Tumi regarding putting Stuart's in default and assigning to Level 8 a new agreement * * * we do have a sales plan of who, how, when and where we present the 'new' Tumi collection. The offer from them of this showroom in New York should be taken advantage of." Galvin testified that Stuart's already had an approved Tumi line for fall 2009 and that selling commenced in December 2007 (pp 206 - 209).
In the same email, Lister wrote "[m]y best way out of this is to suggest that Sam honors the chargeback but instead of having to come up with the whole amount to give to Merchants when it is due, replace my $30,000 monthly for the next five months when he can and take back our $180,000 advances which will be replaced first from profits allowed. I will pay my share to Merchants from that." Galvin explained that Sam or World Cross guaranteed the quality, the landed duty paid, shipment to the customer, and packaging and that all of chargebacks occurred because "instructions were not followed." At no time did Galvin authorize World Cross to pay Stuart's invoices instead of the chargebacks (pp 210 - 211).
An email dated February 27, 2009 from Lister to Galvin states "[t]here is a small glimmer of hope with the lower overhead, a producer for most of the goods can be found, and Sam is certainly a possibility. Assuming we could get the sales in the first place, we can borrow enough money based on a new concept, new participants, new factors, new presentation, etc., we just might be able to have enough to get through some of the debts" (p 212).
In an email dated March 12, 2017 from Galvin to Edelman, Galvin writes "[a]s a partner in this company, I am to be advised and included in any meetings or conversations with any entity outside of our company as it relates to financial discussions, assets, liabilities, confidential information or other relative to these topics of running our business. No commitments of any kind are to be made by you on behalf of Stuart's, LLC without my concurrence and signature with all your private meetings, without my knowledge, with Peter, Sam, and possible Tumi, Inc., [*5]relative to our licensing agreement. I'm sure you will appreciate my concerns in the events going on around me, around and without me or my knowledge to date." Galvin said he wrote this email to Edelman because he "knew from the prior information" that Edelman "was having meetings going back into fall 2007 regarding these topics without [his] knowledge, as well as other meetings with Hana Financial" (pp 214 - 215).
Galvin testified that there was an order from Aeropostale dated February 10, 2009 that was to be shipped between August 10, 2009 and August 17, 2009 but Stuart's was unable to ship; that order was subsequently shipped by Level 8 (pp 231 -233).
On March 16, 2009, Edelman and Lister and Hong met with a Tumi representative. Although Galvin knew of the meeting, he did not attend (pp 236 - 246). Four days after this meeting, on March 20, 2009, Edelman received a letter/notice from Tumi's attorney, Mr. Holt, stating "I'm general counsel for Tumi, Inc. Please take notice that Stuart's, LLC is in default under the licensing agreement between Tumi, Inc. and Stuart's, LLC, the license, by reason of its failure to pay royalties to Tumi, Inc." On the second page, Holt states "[a]ccordingly, Tumi requests that you pay unpaid royalties due to Tumi by no later than Monday, April 20, 2009. Please contact Adam Krantzler at Tumi, Inc. for details for the amount of royalties currently due * * * * In the event that the above referenced matters are not addressed on or before April 20, 2009, Tumi, Inc. will need to consider all of its options available to it under the license in order to address these defaults and protect its interest" (pp 241- 254). With regard to the Tumi royalties, Galvin was advised by Lister and Edelman that the "first year's royalties * * * would not have to be paid because of the delay of launch," although he admitted that he did not verify this information with Tumi. Galvin was aware of Tumi's termination rights upon default (failure to pay royalties) and that a party's failure to cure within the prescribed time periods could result in Tumi "calling" a default. Galvin did not see the default letter until after the cure period because Edelman "held onto it." When asked if Stuart's would have the ability to pay the royalties at that time, he answered "Mr. Lister was putting money into Level 8, as noted here on the document, default letter, and that money would have been used to pay any royalties. He did not put the money into Stuart's. He put the money into Level 8" (pp 324-333).
Galvin was shown a vendor change form that was prepared on March 19, 2009. Galvin indicated that the vendor listed, at the top of the form, was Stuart's LLC. The document also said, "please only enter the information that needs to be changed" and under "new vendor" was written WCC, with the "actual name" as Level 8 Apparel. Galvin said that changing the Aeropostale vendor from Stuart's to Level 8 was done without his authorization. Galvin was also shown a Domestic Merchandise Vendor Registration Form dated April 9, 2009 from Aeropostale which listed the vendor name of "WCC, Inc., actual name Level 8." A Master Sourcing Agreement, also dated April 9, 2009 from Aeropostale, was signed by Stuart Edelman as CEO of WCC (pp 254-256). Galvin did not authorize any change of name or business to Level 8.
In an email dated March 30, 2009 from Edelman to Donna Fanara [FN3]
, Edelman writes, "Donna, I will answer this for Wayne. We have moved our corporate offices as of last week but officially as of 4/1/2009. I know this is not an excuse but actual situation and rest assured it will not happen again. Our phone numbers did change and are (212-938-0288 and the fax is 212-938-[*6]0688). Our new address is as below and the corporate name has changed to Level 8 Apparel, LLC. But you can still process the orders as Stuart's, LLC until further notice." The email written by Edelman indicated that it was from Edelman and Galvin and also included Galvin's email address. Galvin testified that Stuart's did not change their address and he did not authorize Edelman to notify customers that Stuart's had changed its name to Level 8 Apparel (pp 257- 259).
Galvin testified that on April 1, 2009, Edelman sent an email to former Stuart's employees which was copied to several Aeropostale employees stating "[p]lease note that as of tomorrow, Stuart's corporate name, address and email is changing. This change has already been entered internally in the Aeropostale system. Please update your own records and begin using this email address going forward . . . ." Another email sent by Edelman to the buyer at Nordstrom Rack, which had placed an order with Stuart's for the total buyout of the seasonal merchandise, stated "[w]e moved our offices to 2002 West 40th Street, . . . The corporate name changed to Level 8 Apparel as we are not doing that much leather as we thought" (pp 260 - 264).
On August 12, 2009, Laurence Franklin [FN4]
wrote the following to Edelman, "we want to quickly accomplish three things: One, agreement on payment of past due royalties. Two, agreement on payment of current and future royalties; three, basics of a new contract. . . . Unless we are able to reach an agreement on one and two above, we cannot get to three. . . . If we could get confirmation on above payment schedule, we can then engage in discussion on a new license contract for 2010 and beyond. . . ." Galvin testified that the past due royalties that were due by Stuart's LLC were paid by Level 8 (pp 275 - 276).
A letter dated October 13, 2009 from Tumi to Edelman states "[p]lease be further advised pursuant to section 9.6 of the agreement, the Tumi trademark license granted to Stuart's terminated effective as of April 20, 2009." Galvin testified that he first learned of this document during the discovery process and it had never been sent to him by Tumi or Edelman (pp 278 - 280).
With respect to Stuart's royalties, in a letter from Lister to Sam Kim dated January 8, 2010, Lister writes about several "actions with Level 8 that I have neither agreed with nor wanted to be part of . . . agreed to pay Tumi for the past debt of Stuart's, LLC for over a four-month period, half of which I believe is already done by you." In response to this letter, Edelman wrote Lister, "in regard to your point's one through seven, I need to address some of these. Point two, if this was not done, Tumi would have, without a doubt, stopped us from going forward after we had spent all the money to create a fall 2009 line. There is no doubt that this would have happened as told by Alan Krantzler." Galvin testified that the money spent for the 2009 line for Tumi was from Stuart's LLC (pp 287 - 290).
Galvin testified that his primary role in Stuart's was in the areas of sales, operation, finances, and the handling of the books whereas Edelman's focus was in production, teching of garments, and overseeing design and sales. He stated that at the end of July 2008 or early August 2008, he directed Edelman to take over the finances of the company. He stated that, "the deliveries of our merchandise that we quoted to the marketplace were considerably late, . . . the salesmen were calling up consistently about shipments so that they could get paid the [*7]commissions and the vendors were calling in. . . . I said, you take care of all of this. I'm not taking care of all of this. . . . We were getting phone calls all the time for payment against invoices let's say for skins and trims, dealing with Lister as it relates to the money needed for operating expenses and we're not shipping any merchandise, we're not getting any receipts due to the rates of deliveries that [Edelman] was overseeing . . . And I delegated the responsibility to him" (pp 300- 308).
With respect to the Tumi designs: after Tumi approved designs, they would then belong to Tumi; the outerwear line was a new type of product for Tumi; and Galvin did not consider this a risk for Stuart's as it was an "exciting opportunity that we were able to achieve against other manufacturers that wanted the license as well" (pp 334 -336).
Hana became the factor for Stuart's in July of 2005; in March of 2007, Hana contacted Galvin and said it would no longer fund the operating expenses. Galvin and Edelman entered into an inter-creditor agreement with Hana, with personal guarantees, that included making monthly payments beginning on January 10, 2008. 
When asked if he thought Stuart's would be able to make the large payments required, Galvin said, "[b]ased on the projections and what was going on in 2007 at retail which was explosive and our projections, we would have been able to meet this, except that there was a catastrophic financial crisis in America that started in August." Galvin said that at least nine payments were made before they were unable to meet the next big balloon payment. However, Galvin was not concerned because Lister agreed to make the payments; and, on November 10, 2008, Lister said he was going to pay $100,000 to Hana on behalf of Stuart's. Galvin stated, "Worldwide Sourcing Group was the funding arm of Stuart's. There was an obligation on the table. Galvin said he did not have anything in writing that Lister would cover the payment but said, "he agreed to it, otherwise Hana would not have released Stuart's" (pp 337 - 355).
The May 20, 2008 agreement with WSG states, "[u]pon the payments of all obligations due and owing by Stuart's to Hana, and to all other creditors to Stuart's as of December 31, 2007, WSG shall be admitted as a member of Stuart's with the same designations and rights as Wayne Galvin and Stuart Edelman." With respect to this agreement, Galvin admitted that it did not say that the obligations due and owing were by Peter Lister or WSG, but, rather from Stuart's to Hana; yet, Galvin maintained that Lister was obligated to make the payments under the December 23, 2007 letter to Hana (pp 355 -358).
Galvin testified that in November of 2007 Stuart's was having trouble meeting payroll expenses. On November 8, 2007, Lister sent him an email with copies to others stating, "I have agreed to loan approximately $50,000 total to several individuals owed payment for salary by Stuart's. This is a personal loan to be repaid when Stuart's or Nuco is funded and can enter these amounts on their records." Yet Galvin testified that in a prior private meeting, Lister told him personally "he wanted to contribute and give the company $50,000 to cover payroll out of his personal account, and if he lost that, it was no big deal." One of the personal checks written by Lister was to Galvin for $5,000 in which he stated was for salary on a "k1 basis to draw"; it did not state "loan" on the check (pp 359 - 369).
In an email dated October 31, 2007, Galvin, wrote to Lister, "[y]our total support for 2007 through 2008 would therefore be 1.0 million." He agreed that he was requesting Lister's financial aid for the remainder of 2007 through 2008 as "that was part of the conversations that [*8]we were continuing to have with Mr. Lister." Galvin explained that the promissory note for $900,000 referred to infusions of cash into Stuart's. He stated, "[i]t was not a top. It was an agreement that for $900,000 he would get 33 percent of the company at a future date. It doesn't mean he couldn't put in ten million dollars if he wanted to. For 33 percent of the company it was a $900,000 agreement" (pp 372 - 377).
Lister wrote the following in an email to Galvin, dated June 6, 2008, "if we do not cut expenses substantially we will be out of money in July somewhere." Galvin said that statement was not accurate, yet they had discussions from the "inception of the company to watch expenses and always try to reduce expenses." In subsequent emails, Galvin agreed that he understood Lister was making reference to laying off employees such as Michael, Jennifer and Carlo Quintiliani. In fact, he "wanted Carlo Quintiliani terminated from the company before he would approve the next payroll for the staff. Then throughout he wanted Michael and Jennifer to be terminated from the company. I told him, I'm not dismantling my company." (pp 378-381).
In a letter dated October 31, 2008 to Lister, Galvin wrote, "[p]lease advise as I am constantly advised we have no money." In a later email dated February 9, 2009 Galvin stated, "I know I'm the bad guy because this constant personal charges frustrate me when we are not cash flow positive." Galvin also agreed that on January 7, 2009, Lister advised him and Edelman that he was no longer going to loan any monies to Stuart's. Yet, when questioned numerous times about whether during this period of time did he consider Stuart's "cash flow positive" he answered yes (pp 378 -388).
During the trial, Galvin was presented with year-end financial statements from 2004 to 2007 wherein each year showed Stuart's in financial deficit. Specifically, the accountant's review in the 2006 statement, it stated "the company incurred a loss during the current year of approximately $174,000 and has a working capital deficit of approximately $339,000. These factors raise substantial doubt the company's ability to continue as a going concern." When asked if during this period, did he ever consider Stuart's filing bankruptcy, Galvin answered, "no" (pp 390 - 400).
In November 2007, Galvin went to the hospital with chest pains due to stress caused by financial issues with Hana and concerns about Edelman's abuse of the company credit card by regularly charging personal expenses to the card. He also felt Edelman was not handling monies correctly on behalf of the company. Although this concern continued into mid-2008, Galvin did not attempt to regain the financial operations of the company (pp 400 -402).
In February 2009, Galvin again went in to the hospital because his wife was, "concerned about my health, my frustrations, the high anxiety and stress I was under knowing what was going on around me." He testified that he was in the hospital for a period of two hours. When asked what he meant by "what was going on around me," he stated, "the four individuals were in collusion to take over the company." He referenced a phone call that he had received from Edelman on January 2, 2009, in which he said that Edelman "informed me that he and Peter Lister and Sam Kim wanted to take over the business. Sam wanted the Aeropostale business, Peter Lister wanted the Tumi business, and that they wanted to move me out of the company." He said at that time no reference was made to Michael Hong (pp 402 - 404).
On January 16, 2009, Galvin attended a line review meeting with Alan Krantzler of Tumi. Galvin was upset over last minute changes being made to the line at the menswear trade show. [*9]An email from Galvin to Krantzler dated February 24, 2009 included an apology from Galvin for his behavior at the meeting.[FN5]
Galvin was asked if there were any times when he was unable to maintain control over his emotions and attitude internally or with vendors. He answered "there was constant frustrations with vendors" (pp 406 - 413).
Galvin stated that on the morning of January 6, 2009, he had a private meeting with Michael Hong, Jennifer Barone and Edelman at which he expressed his belief that they were providing confidential information to Kim about Stuart's. In late January or early February, Galvin again met with the staff and informed them Stuart's was unable to pay salaries. Galvin also said "I called Michael Hong . . . and I asked him if it was true if he was in discussions with G-III, and he informed me that if Stuart - - wherever Stuart goes, if he leaves the company, he is going with him" (pp 421 -425).
The following excerpts from an email dated February 5, 2009, written by Galvin to Edelman were read and for the most part verified by Galvin as to truth and accuracy:
[T]he pressure is great and the burden is heavy. . . based on the realities of our business, we are in no financial condition to continue operating. As this is our key selling season, our expenses arise in our efforts to sell the product lines. Our support vendors are shutting down our account, and I'm sure we will be taking the appropriate action steps through collection agencies. NEX Worldwide will no longer handle our shipping and ACI will commence the same action steps. Any shipping can only be done at the highest rates through FEDEx and UPS which are billed to our firm Amex account. Amex shut us down at the beginning of January and will again sometime in February. We have not paid Hana, which is evaluating their next action steps. Poland Springs, Coffee Classic have closed our accounts. We can no longer pay Lydia for part time tech design which will affect orders and quality of product. We are currently running 30 plus days past due on rent, Amex, and months behind on fabrics, skins, trim and sample bills. Our professional fees for legal and accounting and marketing are past due anywhere from 9 to 18 months. Office supplies will probably be shut off by March. Con Ed will take their necessary steps as well based on their notices to us. Salesman commissions are over 30 days past due. We need to schedule a meeting to discuss the immediate steps to commence an orderly shutdown.[FN6]As you are aware, Aeropostale will cease doing business with us when they find out that we are bankrupt or cease operations and try to move their business to another entity. This has nothing to do with relationships, pricing or quality. As a public company, this is in their bylaws. [Edelman] has met with their chairman and legal team which has confirmed this in no uncertain terms. On Monday, we will have a meeting with the staff and advise them of these realties and that they need to focus their efforts on seeking employment elsewhere as we can no longer meet payroll, health benefits and [*10]operations. Our next step will be to notify our retailers, manufacturers and supply vendors (pp 437 - 443).
Galvin testified that in the month of February "we became an unfunded operating company," and were unable to: repay any of the loans that Galvin had made to the company; pay manufacturers for the products that it was seeking to market; pay salaries to its employees and officers; repay WSG monies borrowed; repay Hana interest or principal on the loan; and pay the American Express bill (pp 445 - 453).
In an email dated February 27, 2009, which Galvin claims was a "pressure email,"[FN7]
he wrote to Edelman, "evidently with you and Michael cleaning out our offices and the removal of proprietary Tumi information such as samples, design, sheets, tech pack, et cetera, the reality of the situation was very clear * * * [w]e need to advise Tumi of our inability to continue as their licensee." He also asked Edelman to "review the following before I send": 
It is with great disappointment I have to write you with reference to our Tumi outerwear licensing agreement.
Based on the difficult economic conditions facing many companies, our funding facilities with our investor group headed by Worldwide Sourcing Group, LLC has been handicapped to the extent we no longer have the financial capabilities to sell and market the Tumi outerwear brand based on the guidelines of our licensing agreement and the sales and marketing initiatives necessary to build the brand in this classification and continue our relationship with Tumi, Inc.
We must therefore return this agreement accordingly. The financial burden of the startup development costs, staff and office requirements were greatly affected by the delayed launch from fall 2007 to fall 2008 which we were unable to recover from (pp 465 - 467).
In an email dated March 5, 2009, Galvin wrote to Edelman stating "[f]ind out from Missy/Sam if a payment [to AMEX] was sent as nothing shows as of today which keeps the account locked down." 
In another email dated March 26, 2009, Galvin asked Edelman "did you find out what bills were paid yesterday?" Galvin said he was asking if Level 8 or WCC had paid the bills, as "[t]hey had already taken over the company." In another email sent the same day from Galvin to Edelman discussing a Ricoh printer at Stuart's, Galvin said "[w]ill you have it moved to your new location . . . and take over payments by having it billed to Level 8 or get in touch with them to try and cancel the contract and have them pick it up as Stuart's is shutting down." (pp 473-476).
In an email dated March 4, 2009, Galvin wrote to Edelman, "instead of moving Krantzler's appointment, I won't come in Thursday so you can meet privately. That meeting is too important especially to keep it this week." In a March 9, 2009 email, Galvin stated, "with all your private meetings without my knowledge with Peter and Sam and possibly Tumi, Inc. relative to your license agreement, I'm sure you'll appreciate my concerns in the events going on around or without me or my knowledge to date." (pp 480 - 487).
In view of the actions of Edelman and Lister, Galvin secretly tape recorded conversations with Edelman and/or Lister on March 9th and March 16th (pp 483 -485).
The court notes that much of the cross examination testimony elicited by defendants other than WSG and Kim, was duplicative as was the re-direct. The following is a summary of some that testimony: 
When asked, "what were you going to do in 2008 to change [the deficits experienced by Stuart's]", Galvin replied "we were the licensee for Tumi, which is probably one of the most globally-recognized labels in the world at the higher end of the business that we were trading on." He expected significant revenues from the license (pp 515 -525).
Galvin admitted that Michael Hong was an "at will" employee, free to leave the company at any time. He was never a principal, officer, member, or investor of Stuart's LLC. He was the creative director. Galvin was asked about several emails that he had read from Michael Hong's personal email account. He testified that he did access Mr. Hong's private email, stating, "if it's on the company computer, my computer, I can access the information. If he wanted to maintain privacy after he resigned, he could have deleted his entire Gmail account." (pp 529 -546).
According to Galvin, Hong had admitted to him that he had disclosed proprietary information and information about Stuart's to people outside of the company. In 2009, Galvin called Hong and asked him "what happened to the designs that were up on the wall, all of the information, designs and the tech packs." He said Hong told him that "he threw out the tech packs, the flow charts, the designs that were up on the wall because they had to start working on spring of 2009 - 2010, which would not have been until a much later date because we were right in the middle of selling fall 2009. . . . We are not going to be throwing away the entire season's tech packs and information from Aeropostale that is still issuing orders for fall of 2009" (pp 564- 565, 571).
Galvin was asked, "[d]o you believe that Mr. Hong breached his non-disclosure agreement for the sole reason that he was working for Level 8 after he left Stuart's, LLC?" He said, "Absolutely." When asked if it was the only reason he believed he breached the agreement, Galvin said, "it is the key reason." (pp 574). Galvin also admitted that Hong was not the only former employee that had access to various proprietary information (pp 548- 553).
Galvin was questioned about the increase in sales from $920,000 in 2005 to $2,157,000 in 2006. He replied, "[w]e had additional orders - - we had orders again from Aeropostale and we were achieving greater penetration into the marketplace as a start-up company." He was asked why the sales doubled yet they still lost money. He replied, "[t]here was a tremendous expenditure, we increased our showroom space for 2006, we took an additional showroom, we built a vestibule, and a tremendous amount of expense for the Tumi license, putting together the Tumi line, and taking on additional expenses for the Tumi launch that was supposed to take place on January 2nd." When asked what Stuart's was doing to assure that the company would continue to be a "going concern," he replied, "we were increasing our business with Aeropostale substantially, we were increasing our business on private label, and most excitingly we had the Tumi license for outerwear again, one of the best recognized brand labels in the world, at the upper end of the retail spectrum." (pp 582 - 586).
In an email dated October 17, 2008, Edelman wrote to Susan Lee, Vice President of Hana Financial, "FYI, Tumi understands exactly what not only we are faced with, but also themselves [*11]with this current economy, and have extended out our payout with them along with extended the license agreement for an additional twelve months." (p 617).
Testimony of Stuart Edelman
Mr. Edelman testified that after graduating college in 1974 he worked in various garment businesses. In 1993 he started a garment business which later merged with Gordon & Ferguson. He became an employee of a subsidiary company called G & F Enterprises II. He was terminated in 1995 or 1996 due to litigation and an eventual judgment against him. The judgment, which was for $2 million, remains unsatisfied (pp 653- 654)
Edelman started Stuart's as the sole partner in 2004. Approximately a few months later he was approached by Galvin, whom he had met at Gordon & Ferguson. Galvin wanted "to be involved with the company." He joined Stuart's as a managing member. Mr. Galvin initially loaned $16,437.74 to Stuart's on May 5, 2004. On May 13, 2004, an operating agreement was signed with initial capital contributions of $10,000 each. Under the agreement, Edelman owned 19% percent and Galvin 81% of Stuart's. The unequal distribution reflected Galvin's anticipated monetary contributions to the company and the outstanding judgment against Edelman (pp 655 - 662).
Their agreement concerning distributions was not based on ownership interest but was on a "as-needed basis." Edelman disagreed with Galvin's testimony that the distributions were to be 50/50. Edelman did know that the money that Mr. Galvin invested in Stuart's was from a home equity loan and he admitted that Galvin was the only person who was willing to help him financially (pp 662 - 665). 
In July 2005, Stuart's borrowed from a factor (Hana Financial), which also required Galvin to sign a personal guarantee. Stuart's did not have a relationship with Aeropostale before Galvin became a part of the company. In 2006, the financial statement showed sales of over $2 million with an operating a loss of $172, 092. Edelman attributed that deficit to the investment made for the Tumi license (pp 665 - 674).
Edelman confirmed that Michael Hong was hired in anticipation of obtaining the Tumi license. Edelman did not know that Hong signed a non-disclosure agreement until recently (pp 675 - 679).
Regarding the Tumi License Agreement, Edelman testified that he understood that the license was exclusive to Stuart's and that it could not be assigned to anyone (pp 680- 681).
Edelman was introduced to Peter Lister after the Tumi license was obtained and formed a business relationship when Stuart's could not obtain additional financing. Edelman described Lister as a "funding partner." Galvin and Edelman agreed with Lister that he would draw $1,000 a week and would have 10% interest in Stuart's and that he would be able to participate in major decisions (pp 682 - 691).
The Tumi license became effective July 10, 2007 and was expected to start shipping in fall of 2008 the "launch" of the high-end Tumi brand was delayed by a year (pp 692 - 694). As a result, Stuart's was limited to producing the T- tech label merchandise at first. 
In 2008 Edelman became aware that Aeropostale was going to give Stuart's a $2 million "back to school" order. Edelman told Galvin and Lister about the projected order (pp 694 -702). [*12]In an email to Lister dated Dec. 10, 2008, Edelman wrote: "[t]he company is poised to create, market, produce and sell an impressive volume to both Tumi and Aeropostale in 2009. . . . Although I have listened to my staff, Sam and you on these recurring issues with Wayne, it has taken till this very moment to recognize that a buyout arrangement must be offered and executed immediately, not a moment longer." In the same email, Edelman recommended a "buyout" of Galvin for $400,000 (pp 707-708). 
At trial, in regard to this e-mail exchange, Edelman testified that: "I think there was an issue, for all intents and purposes, bankrupt, but without filing bankruptcy at this point, so I believe it was just easier and safer to move it to Worldwide because already Tumi had known about Worldwide. There was no issue. We were in trouble. We were desperately trying to figure out how to survive" (pp 703 - 706).
When asked about business prospects for 2009, Edelman testified that, "[w]e expected our business to be better, correct." In January of 2009, Edelman had a conversation with Geiger, the CEO of Aeropostale in which they discussed taking the business to another entity; Geiger suggested "that somehow we find a way to continue under Stuart's . . . and not file bankruptcy." According to Edelman, Geiger "never told me to get rid of Wayne [Galvin]" (pp. 708-711)
When asked "[d]id Sam [Kim] tell you that he wanted you to get rid of Wayne," he testified, "He did say those words. Yes." At one point, Sam offered a loan of $100,000 to buy Galvin out (pp 711-712).
Edelman testified that Galvin's testimony concerning their phone conversation that occurred on January 2, 2009 was "in general correct." He also told Galvin "that it would be best if he would step down from his position and I was trying to find a way of compensating him and that's why I was looking to get loans . . . to get him paid back his investments . . . and [offered] $400,000, up-front payment and then a payout over a period of time." In an email response to that conversation, Edelman agreed that Galvin asked for $400,000 but he also wanted all his loans to be paid back, wanted to be indemnified from obligations he was responsible for, such as the Hana loan, and he also wanted 20% share of the company (pp 714-717).
Edelman denied participating in the formation of Level 8 on February 11, 2009 (a time when he was still with Stuart's). He testified that "I intended to leave my employment on February 11th, but I did not know that Level 8 was formed on February 11th." Three employees resigned on February 24, 2009 and Edelman resigned shortly thereafter. Edelman joined Level 8 as a 31 % partner with Robert Spiegel as the nominal owner of his interest.[FN8]
Edelman said, "[t]he 31% ownership never happened." When asked, "at any time were you an owner, he answered, "no." Later, during cross-examination he said that "early on when I was asked to join this new company . . . and that I would be a 31% owner . . . [but] the arrangement was never finalized and instead the total shares of the company were put into Kuk Ja Kim's name . . . . [T]he company just operated that way." Although Edelman was not an owner he claimed to be entitled to 31% of the profits (pp 732-36, 925- 928).
On March 16, 2009, Edelman and Michael Hong met with Alan Krantzler about the Tumi [*13]license. At that time, Edelman "wasn't sure if Stuart's still owned the license" although the subject matter of Stuart's default with respect to the Tumi license was addressed at the meeting. Four days later, Tumi notified Stuart's of the default (discussed infra) (pp 765 - 769).
Some of the Tumi line presented by Stuart's for the fall of 2009 season was approved before Edelman's resignation. He also agreed that the Tumi line that was sold by Level 8 was slightly modified from the Stuart's line with different styles (pp 770 - 773). 
Edelman admitted that he dealt with Aeropostale to create a vendor relationship with Level 8 and that he worked with them to secure an Aeropostale merchandise vendor change. When discussing the actual change form, he agreed that it listed the vendor number 99898, which was Stuart's vendor number, but also listed World Cross as the new vendor. In Ex. "97" the Domestic Merchandise Vendor registration, it indicated World Cross as the vendor with the number 99898 which he again admitted had been Stuart's number but was then World Cross's vendor number (pp 776- 782).
Edelman sent an email to employees Aeropostale and others stating, "Hi everyone, please note that as of tomorrow, Stuart's corporate name, address and e-mail is changing." At that time, he had already resigned from Stuart's (pp 783- 784).
Edelman became aware that Lister was making contributions in the amount of $30,000 a month to support Level 8. Edelman testified that, "[i]f Peter didn't make contributions, then there would be a problem" (pp 797, 800).
In regard to the Master Sourcing Agreement dated April 9, 2009, Edelman misrepresented his status to Aeropostale when he told them he was CEO and president of World Cross on April 9, 2009 (pp 800- 801).
Edelman received a letter from Tumi that was written four days after his meeting regarding the default of Stuart's and was not sure why it was sent to him and not Galvin (pp 808 - 813). In a phone conversation, Krantzler told Edelman that Stuart's license had been terminated. Edelman did not know the license was not assignable. Edelman informed Tumi that it needed to contact Galvin as the managing member (pp 808 - 822).
Edelman admitted that Level 8 sold Tumi products in 2009 before the termination notice to Stuart's dated October 13, 2009. When asked if Galvin consented to this, Edelman said, "[h]e never consented" (pp 823- 827).
In discussions with Laurence Franklin (CEO of Tumi) about royalties, it was understood that if Level 8 did not pay the past-due royalties from Stuart's sales in 2008, they wouldn't give Level 8 a new agreement." Edelman testified that Level 8 accepted Franklin's proposal which is summarized and detailed in his e-mail of August 12, 2009. In an email dated August 16, 2009, Lister stated "the past obligations are from Stuart's, LLC. Stuart's is now attacking all of us and attempting to link Level 8 Apparel as a successor to Stuart's thereby making all debts payable by Level 8. That is neither possible or acceptable. . . . We are willing to negotiate a payment to Tumi for this debt of Stuart's, but payable in the future, when this case is no longer an issue. Not when it can be linked in court as a Level 8 takeover responsibility." Edelman said he understood the comments since they were being sued and it might result in someone concluding that Level 8 was a successor to Stuart's. He further testified that the $116,000 in royalties owed by Stuart's for 2008 to Tumi, was actually paid by Level 8, sometime after December 22, 2009 (pp 827- 837).
Exhibit 32 at trial was an email from Edelman to Lister stating, "Peter, as you are very much aware there are several critical issues at Stuart's, LLC. The problems are centered on Wayne's lack of contribution and negativity. His presence has been disruptive and threatens to dismantle everything our staff has worked so hard to establish" (p 855)
Edelman testified that even after Lister loaned between $900,000 to $1.2 million, "Stuart's was out of money by the end of January, beginning of February 2009." He also said he did not recall Lister ever agreeing that he would make any of the needed payments if Stuart's couldn't make such payments and he understood that he and Galvin were responsible for the personal guarantee. Also, to his knowledge, no payments were made to Hana from August 10, 2008 through June 10, 2009 (pp 873 - 881).
In regard to emails of resignation from three employees (Ex. "50", "51", "52"), Edelman testified that he and Galvin had told the employees that they did not have money for payroll and Stuart's would be unable to pay them. Edelman also noted an email he received from Galvin (Ex. 55) stating, "[w]hen Tumi finds out next week there is no staff, the results can be detrimental to maintaining the license" (pp 888-892).
As of December 2006 Stuart's was working on approximately 26 percent profit margin which Edelman considered low compared to competitors. He discussed the Stuart's strategy and hoped that more sales would lessen the cost of materials to help with the margin. He also said that the operating expenses were 30.08 percent which meant they were operating at a loss. In an email dated October 17, 2008, Edelman wrote to Mr. Lee (Hana) that they "have cut, slashed and burned our overhead to the bare bone." He also stated that he and Wayne were "not drawing big money." (pp 965- 970)
Edelman testified concerning sales projections that were made for Stuart's by the accountants for the company. It showed a projected loss of $40,000 (before taxes) for 2007; for 2008 a $939,300 projected gain; for 2009 a $1,651,574 projected gain and 2010 a $2,986,604 projected gain (pp 971-974).
Hong had told Edelman prior to his resignation that he, Hong was thinking of leaving and that he had an opportunity with another company called G-III3. Edelman said that no mention of Level 8 was made prior to Hong's resignation. When asked why Hong was leaving Edelman said, "[h]e saw that the company was in very deep financial problems, and he also saw that the working conditions and the environment was very, very hostile" (p 996).
When asked "[d]id Level 8 use the drawings that Stuart's prepared for approval of its fall 2009 line with Tumi?", he answered "[t]he styles that were approved by Tumi that were going to be reused were used and in some cases altered." When asked how it was possible for Level 8 to get the line approved and started to sell between March 16th to the end of April, Edelman replied, "it was possible by styles - - there were styles that Tumi approved already that were doing business with in [the] prior season, those were just slight modifications, and the modification was just a trim" or a logo on their luggage" (pp 1029-1030).
Edelman also testified to the following:
I never took anything other than my own personal belongings from the company, and there has not been any testimony or witness to deny that.
Two, non-private meetings were held, as the meetings alleged were openly announced [*14]with emails and verbal announcements and had open invitations to the plaintiff.
Three, instead of purchase orders from Aeropostale, we've only seen as evidence Excel worksheets and Excel spreadsheets that were produced not by Aeropostale.
When I was given the authority and direction to run the company, second-guessing or hindsight is not a proper response to make the allegations we've heard in court.
No differential agreement is in writing, but only the plaintiffs' Excel spreadsheet of both members' draws.
When given directions from the 81 percent shareholder to proceed with a shutdown, I did so and then say it was only a pressure tactic from the plaintiff or a pressure email to get my attention about the capital of 81 percent shareholder had at risk is not the basis for this action against me.
As far as my counterclaims, the plaintiff has demonstrated his failure to provide me with his fiduciary responsibilities and obligations as demonstrated by amongst other acts, the actions of sending a threatening pressure email causing harm by ruining the credibility of the company's inventory by falsely stating its quality is below standard in order to pressure Worldwide sourcing, our funding arm, to continue funding over and above its contractual obligation, and stating their damages from this inventory claim would be greater than their . . .loss.
Testimony of Peter Lister
Lister stated that he loaned Stuart's in excess of $900,000 before any agreements were signed. He explained that he advanced the money before the signing of the agreements because, "I didn't want the personnel to leave and then have no business. Because merchandise had to be ordered. Business has to run. That was a leap of faith" (pp 1471 - 1473).
Regarding his funding arrangement with Stuart's, Lister stated: "I went and had a meeting with David Chu and asked him what his plans were and what he thought of the outerwear or having an outerwear division with Tumi, and he impressed me" (p 1115). Lister was asked, "[d]id you perform a due diligence investigation of the books, the records, the customers, the suppliers, the vendors of Stuart's, LLC before you got involved with them?" He responded, "No. . . . First of all, I was negligent, as it turned out. And second of all, my concept was different from what they had done in the prior years. I was interested in the merchandising ability of David Chu. I thought his influence, Stuart's sales ability, and Wayne, for whatever he did, could have put a business together that would have been profitable and I would have been happy to be part of. I was wrong." (pp 1115 - 1118)
Before Lister entered into the loan agreement, he was aware of Hana Financial, stating, "[t]hey had advanced funds to Stuart's in the range of . . . $600,000." He went on to say that the reason he did not buy into the company and become an equity owner in 2008 was, "because of the losses. . . Hana was part of the losses." Lister thought that if he became an equity owner of the LLC, he might be responsible for the Hana loan, which is why he agreed to loan Stuart's (up to) $900,000 through WSG. In addition to the loan agreement, there was a separate Letter Agreement to pay for the manufacturing, which did not set a limit on the amount to be loaned. In this regard, in an email dated November 2, 2008, Lister wrote to Edelman that "[t]he inventory [*15]loans don't have a max, as such, but I sold them [Merchant Factors] on the idea that everything was sold and that these advances would turn into receivables almost the same month" (pp 1126 - 1132).
Lister was asked in looking at the projections, when did he expect Stuart's to become profitable. He answered, "July of '08." The projections were made part of the loan agreement. In regard to previous losses, the accumulated losses from the past did give him concern. He clarified that when he projected profit that it, "did not wipe off four, five years of losses prior. I never expected that. That's why I wanted to separate myself from the prior losses." He structured the deal so that he was insulated from the past losses and debt to Hana (pp 1376 - 1378).
Lister was asked to describe a typical transaction where he as WSG was involved on behalf of Stuart's. He explained:
Stuart's is a selling organization. To meet those sales, they have suppliers that supply them the merchandise when they order it. When they order it, they ordered it from Worldwide Sourcing, because when the inventory came in I wanted control of that merchandise until the time it was sold. So they wrote orders to Worldwide Sourcing for the merchandise that they sold. They submitted the order from the customer to Merchant Factors to make sure that it was creditworthy and the delivery time was in a time that the orders to the suppliers were written for so that the merchandise could get here in time. At that stage we signed the order, the merchandise came in, I paid for the merchandise, I paid for the transport, I paid for the freight and duty, and I paid for the warehousing that we put it in. That was Waitex. Then when the time came to ship it, we transferred the ownership of the merchandise from Worldwide Sourcing to Stuart's and the invoice was created and factored with Merchant Factors (pp 1473 - 1474).
Lister explained that under the agreements, Merchant Factors was to be paid 100% of any money it advanced for the merchandise ahead of any repayment to him of the $900,000 loan. Lister stated that Stuart's never distributed any monies to WSG. "The intent was that when enough profits were made or if enough profits were made to pay off Hana and when there was enough profits to pay off the old debt, I was willing to go forward as a one-third partner." That condition was never satisfied (pp 1480 - 1484).
Lister testified that there did come a time that he personally, on behalf of Stuart's, negotiated an arrangement with World Cross involving Capstone. He stated "World Cross Culture manufactured the merchandise that was being shipped to Aeropostale. Capstone was World Cross Culture's factor. So World Cross Culture, through Capstone, paid for the merchandise, shipping, the freight, the duty, and delivery to Aeropostale" (pp 1138- 1141).
Lister was asked about testimony concerning payments he made to the employees of Stuart's in December 2007. Lister had testified that the checks issued to employees said "loan" on them, however, when he was shown copies of the checks which contained no such notation, he agreed that he had been mistaken (pp 1142 - 1143).
An email dated August 15, 2008, from Lister to Jeff Neville and copied to Edelman, reads:
Stuart's and thereby Worldwide Sourcing, has spent considerable sums and time to research, design, sell, promote, etc, the line that Capstone's client is now producing and delivering.
It is a process and effort that has been going on since late in 2007. To now renegotiate the terms, by an attorney employed by the factor of the producer, is a not welcome surprise and not acceptable.
For Stuart's, if I understand correctly, to wait until late in 2008 to receive any of the funds paid by Aeropostale, rather than their earned commission of 8.3 % of the sales as of the Aeropostale payments - - as the Aeropostale payments are received, seems to me not a workable idea to bring up at this stage and never discussed during the negotiations prior to placing the original orders (pp 1145 - 1146).
In an undated letter from Lister to Alan Krantzler (from Tumi), he says "I appreciate the offer of the reduction of royalty payments due in 2009. However, rather than accept the charitable contribution for Stuart's, I believe in all fairness what they require is only a change in the commencement date of the contract period to a time twelve months later." Lister said Tumi agreed not to take a default after he wrote the letter, at least for the time being. In fact, Tumi did not "take a default," notwithstanding that royalties weren't paid in 2007 or 2008. It was only in March 2009, four days after the March 16th meeting with Lister, Mr. Edelman and Tumi that a default was taken against Stuart's (pp 1152 -1159).
Lister agreed that he was aware that one of the creditors was Galvin, but did not agree that he would benefit by keeping the profits away from Galvin inasmuch as Stuart's was unable to produce any more goods at the time. That same day Edelman responded to Lister saying "I like the idea about Tumi out of Stuart's." Lister testified that the plan "got stopped in its tracks because Tumi wouldn't go along with reassigning the license, so the issue was closed" (pp 1161 - 1167).
In an email dated January 12, 2009, Edelman wrote to Lister that he had a meeting with Julian Geiger, of Aeropostale and that "[Geiger] is certain that we will double our business this year, and they are planning to visit the factories [where] Sam is producing our goods." The same day Lister wrote in an email to Edelman: "[w]e had, more or less, a plan of action and we aren't moving an inch forward. If we don't change anything, we can't do a thing for the balance of the year without risking every creditor to say we sold, designed, planned the whole season as Stuart's and they have a right to take the profit no matter who the company that ships it is" (pp 1168 - 1169).
By email dated February 27, 2009, Lister wrote "[t]his is mainly for Stuart, certainly for Michael and definitely for Sam since we are all associated and I think emails meant for one should concern all three of us." When asked about how everyone in this list was associated, Lister responded "we were all part of the group that formed Level 8." Later in the email, Lister wrote "I received a long email from Wayne worrying about his future and explaining why we should remain in Stuart's together with the now lower overhead. I'll answer him later . . . ." In his email to Galvin, Lister stated "[t]here is a small glimmer of hope. If with lower overheads a producer for most of the goods can be found (and Sam is certainly a possibility) assuming we get the sales in the first place and we can borrow enough again based on a new concept, new [*16]participants, new factor, new presentations, etc., we just might be able to earn enough to get through some of the debts." When asked if he was sincere when he wrote this email he said, "no"; when asked if he was being dishonest, he said, "I was being kind." He finally agreed that he was being "slightly" dishonest (pp 1178-1185).
Lister testified that under the arrangement for funding of Level 8 at the inception, he and Sam Kim were each going to lend 50% for the overhead required until the company became cash self-sufficient with each contributing $30,000 per month (pp 1190-1191).
Lister represented that he was aware of the resignation of Jennifer, Michael and K.K. Park from Stuart's before it occurred (p 1198)
During the initial discussions about the formation of Level 8 which involved himself, Kim, Edelman and Hong, Lister remembered Kim saying that he was against Galvin coming into the new company. He agreed that there was discussion about a buyout of Galvin and said "[t]he discussion was mostly I was not going to contribute" and that Kim was willing to finance $100,000 for the buyout: "I don't know if it was a loan or pay, but yes, Mr. Kim would transfer the money to Mr. Edelman to give to Mr. Galvin." He stated that Kim was told the purpose of the loan was "to get rid of a nuisance factor * * * [because] [Galvin] could * * * have threatened a lawsuit" (pp 1217 - 1225)
In an email dated April 29, 2009, Lister wrote "I'm in favor of paying those amounts that apply to Level 8 Apparel. On anything else I am in favor of helping Stuart, who is both friend and partner, on the provision that our overhead does not exceed $50,000 monthly." In this email, he was referring to how the $30,000 monthly payments he was making were going to be used and he admitted that some of those payments were to pay expenses of Stuart's (pp 1226 - 1227).
Lister confirmed that he attended the March 16, 2009 meeting with Tumi and on March 17, 2009 he wrote an email to Michael Yadgard (a broker) to find a location for Level 8. (pp 1226 - 1232).
When Lister was asked about previous testimony regarding the back-to-school Aeropostale order in which he said, "there was no money for Stuart's to produce this," he explained that "Stuart's was in a formula with myself and with Merchant Factors of how money would be available and under what circumstances, and we had long since exceeded that." (pp 1237 - 1238).
In an email dated September 21, 2007, Lister wrote the following to Neville Grusd, a principal of Merchant Factor and a trusted financial advisor: "[t]he way things are at this moment, we are not going to participate in Stuart's. After several attempts and revisions in the projections regarding Tumi and Stuart's, the end result is still the same. The loss, is the loss, is the loss." Among the losses Lister was referring to was the Hana debt which was more than a half million (pp 1244 - 1245).
Lister stated that Stuart's intended to pay back the $500,000 owed to Hana from profits which had been projected for 2008 - 2010; the payments were supposed to come from Stuart's profits and not from WSG (pp 1247 - 1249). As noted, Lister refused to pay any part of the Hana debt.
When asked whether he considered investment in Tumi outerwear to involve risk, Lister responded "[c]ertainly." They had no successful history in the market. They had an unsuccessful history with some jackets they made." In an email dated November 21, 2007, Lister wrote, "[a]s [*17]far as their interest might be in Tumi license, I consider that a "liability" at this moment and not an asset. It's not proven for outerwear, has shown no samples, has no sales, but does have a liability to pay royalty and minimums, etc." (p 1250)
In an email dated November 14, 2007, Lister wrote that, "Mr. Grusd's strong opinion is still the same regarding the advantages of a Nuco for going forward, as long as we are reasonably certain that the Tumi license can be assigned to this new company. Doing so would send a strong message to Hana regarding the situation that they are in and make it very much easier to negotiate an advantageous settlement, if any. Other issues in the closet would also remain in that closet." He agreed that the term Nuco would mean shutting down Stuart's and having a new company take over the assets. It was pointed out that this email was written before the email of February 27, 2009 wherein Lister wrote "[f]ollow up with Tumi regarding putting Stuart's into default and an assignment to Level 8 of a new agreement" (pp 1253 - 1255).
Lister indicated that at the time that he signed the loan documents for Stuart's, it was his understanding that Stuart's was insolvent (pp 1255 - 1258).
In an email dated December 24, 2007, Galvin wrote to Lister stating "Peter, as discussed, Hana is not releasing Stuart's, LLC from the contract. This is a stand aside with a repayment schedule as agreed." The agreement didn't involve Lister or WSG (pp 1264 - 1266).
In January of 2008, Galvin wrote in an email: "[w]e need to get funds immediately to satisfy these payments as well as rent, deferred 2007 payroll, etc. As I mentioned, Friday the 11th is coming up as the first payroll for 2008." Lister stated that he did not know about deferred payroll from 2007 but he did know Stuart's needed money for January 2008 and he said, "I paid it" (pp 1264 - 1273).
Although Lister had doubts about the management of Stuart's, he continued to advance funds throughout 2008 into the beginning of 2009, up to approximately 1.2 million. He said, "I expressed concerns with management and management's decision in writing and emails, as well as verbally in the office. Overhead was too high. Sales were too low. I had concerns." Lister was reminded of his deposition testimony where he said, "I knew my only chance was to go through the year and find a successor" (pp 1277 - 1282).
Lister wrote in an email dated June 6, 2008, "[i]f we do not cut expenses substantially, we will be out of money in July somewhere * * * [i]f we hold ourselves down to $50,000 [overhead], we can get into fall near to where we start to ship." In an email dated July 11, 2008, he sought termination of Hong, Quintiliani and Barrone. Although he was aware of Tumi's requirements, their termination was necessary for Stuart's to survive. Galvin refused to fire anyone except Quintiliani (pp 1285 - 1291).
In an email dated June 15, 2008, Lister wrote "[l]ooking at the last sales report, it looks roughly to me as one million of Tumi's sales which I believe will net about $300,000, if we do not get saddled with a royalty payment." Lister stated that he didn't want to pay royalties to Tumi at that time but "[n]ot wanting to pay is a time issue" and in July 2008 he was negotiating for a delay in making the royalty payments (pp 1291 - 1297).
Lister testified regarding Stuart's relationship with Bond, a manufacturer of the jackets wanting payment in advance for the samples it made for the spring. On January 22, 2009, Lister wrote to Boris at Bond stating "I understand that Stuart's is not creditworthy. That is why Merchant Factors and I are financing them, until now." Lister explained that creditworthy meant [*18]Stuart's didn't pass credit when Bond tried to get financial approval for the shipment (pp 1306 - 1310).
In an email written on February 27, 2009, Lister wrote, "Stuart's has been and still is, a lost cause . . . three guys like us . . . [himself, Edelman and Galvin] . . . [j]ust have no way to rationalize losing something over two and a half million dollars (over half of that mine) and hope that there is another angel out there that would supply another six to seven hundred thousand dollars to get into a fall season that almost no one would produce" (pp 1316 - 1319).
Regarding Level 8, Lister was asked if he had removed samples from the offices of Stuart's LLC and brought them to the office of Level 8, and he answered "I rolled one sample case from Stuart's office to Level 8's office." He also indicated that Hong and Edelman were with him at the time (pp 1106 -1107).
Lister was asked if it was his understanding that Edelman and his colleagues were showing Tumi samples at the Las Vegas Market show in February 2009 for sale by Level 8, and he answered, "I would believe that to be correct" (p 1108).
Lister wasn't sure at the time of trial if he was a member of Level 8. When asked when did the question first arise, he said "on the deposition of Alan Krantzler which is really only a couple of months ago. That's the first time I saw the filing document for Level 8 and I saw that Sam Kim put himself down as a hundred percent owner." Lister agreed that there was no written agreement reflecting his 31 percent membership interest in Level 8 but there was a verbal agreement. He said the terms of the verbal agreement were "[t]hat Stuart Edelman, Sam Kim, myself and Michael Hong would share a hundred percent membership in Level 8. Sam and I would supply half the overhead needed for Level 8 until such time where it wasn't necessary." He added later that there was another agreement that loans would be repaid before there would be any distribution of profits. When asked, who was going to make the decision that funding was no longer necessary, he answered, "I don't know. I made the decision for me." (pp 1327 - 1334).
Lister was asked if it was ever agreed that he would be distributed 31% of the profits of Level 8. He answered, "no. . . . [i]t was agreed that there would be no profit distribution until the loans were paid back." He was presented with a copy of an Affidavit in Support of Motion for Leave to Amend, in which he had stated, "[i]t was agreed that I would be distributed 31 percent of the profits of Level 8 Apparel, LLC but this defendant and Sam Kim have failed to live up to their obligation." (pp 1339 - 1342).
Lister was shown the factoring agreement which he signed as the managing member of Level 8 and which was also signed by Neville Grusd of Merchant Factors. The agreement stated "[y]ou hereby agree to sell and assign to us, and we agree to purchase as absolute owner from you, all receivables." Lister agreed that the "you" referred to Level 8 Apparel, LLC (pp 1336 - 1338).
In an email to Missy Moon, with copies to Edelman and Hong, Lister wrote "when Sam reduced both Stuart's and my share of the profits . . . ." Lister was asked why he said profits and not membership interest, he said "I don't know." In the email, he also states: "[r]egardless of the fair percentage, or the amounts I should have put into Level 8, I will leave in what is there at the moment, plus minus $276,000. Other than that, it's been a pleasure helping to put this thing together." Lister was asked if it was his intent to announce that he was leaving Level 8 or contemplating leaving. He answered, "I never left. I stopped participating on a daily basis. I [*19]didn't give up what interest I had * * * There was a period of time during the organization I was in almost every day. I lived obviously a hundred miles a way. When that no longer became necessary, I mean I have other interests, I had other business investments, I was no longer available four, five days a week" (pp 1356 - 1358).
In another email to Missy Moon dated December 30, 2009, Lister wrote: "[t]here is no mixing of issue between Stuart's and Level 8 because we started fresh tracking in February '09. There might be a small mixup separating the interest charges between the two and small error in separating the loans for merchandise from the loans to Level 8." He was asked to explain what this meant and he said, "[t]here was a question I think roughly of some $200,000. I used the same procedure for Stuart's as I did for Level 8 regarding Merchant Factors. There was a question that came up, and it came up again in discovery, whether Merchant made an error giving credit to one firm or the other when it should have been - - one firm and it should have been the other. Since that time in discovery I found out that everything was correct. This issue no longer remains. . . . I am being countersued here by Level 8 for 200-some-odd-thousand dollars which they claim I over-collected. I have since discovered that - - I don't make $200,000 errors. I since, from discovery, found that I came into Level 8 also, which is not listed anywhere, with 400-some-odd-thousand dollars worth of merchandise. The merchandise was testified to, I couldn't bill Stuart's unless it was actually shipped. So I've never gotten credit. When I saw Missy's records from Level 8, I saw that I was never given credit for that money, so that explains the $200,000. It's the merchandise that was shipped to Nordstrom's in Seattle." Lister was asked "but didn't you testify, sir, that you needed to look at Merchant's books to determine whether or not the $200,000 should be placed in a column for Stuart's or for Level 8?" Lister said "that's correct, but I learned during discovery that was not the error. . . . There was never an issue of a misapplication. I know where the $200,00 plus came from" (pp 1358 - 1364).
In an affidavit submitted on a prior motion, Lister wrote "Level 8 Apparel, LLC took over the assets, employees, salesman and major accounts of Stuart's, and upon information and belief is the successor to Stuart's." Lister was asked "[h]ave you always believed that Level 8 was the successor to Stuart's?" He answered, "Yes. I mean, I think there is enough correspondence where I cautioned Level 8 to not act as a successor." Lister was asked if Level 8 took over the debts of Stuart's and he said, "some debts on some occasions." (pp 1366 - 1367).
Regarding the operation of Level 8, it was understood that all participants would have administrative duties: "[w]e all had responsibilities. . . . I got them the factoring contract. I agreed to bring in the T-Tech merchandise at that time. . . . I gave my guarantee and the good-guy clause for the landlord for the showroom. I signed the warehouse contract so they had a place to put their merchandise" (pp 1393 - 1394). Lister also signed a guarantee in connection with that lease agreement (p 1399).
Lister said that Hong was to receive 7% of the profits of Level 8. When he was asked about profit from sales for Aeropostale in October of 2009 of $249,000, Lister said that the profit was distributed as follows: Hong 7%, Edelman 20%, Lister 20% and the rest for Kim. Lister admitted that he had never seen a check or actually been told that anyone actually received this money, although he "had a strong suspicion." (pp 1406 - 1411).
At the time they (Edelman, Lister and Kim) entered into the agreement, Lister believed he was to be a 31% member; he signed the factor agreement and warehouse agreement as a [*20]managing member. Although he signed as managing member, he did not participate in any meeting of the members of Level 8, nor had he seen any minutes or resolutions from such a meeting. And, in regard to the January 2010 reduction from 31% to 20%, Lister testified that "[t]he discussion for the 20% was never about membership. It was always about a payment from profits. . . ." (pp 1542 -1545).
Testimony of Michael Hong
Hong testified about his schooling and employment history and that prior to joining Stuart's he had worked with Edelman and Galvin at Gordon & Ferguson (pp 1553 - 1556).
Hong signed the non-disclosure agreement with Stuart's on May 14, 2007. He remembered Galvin discussing the terms and conditions of the agreement with him and his understanding of what he was prohibited from doing; which was, "simply do not share sensitive proprietary information pertaining to design" (pp 1556 - 1560). Hong never showed the non-disclosure agreement to Kim or Missy Moon (p 1620).
Hong was appointed as the creative designer for the Tumi line for Stuart's. He designed all of the drawings and styles that Stuart's used in the 2009 fall line (pp. 1564 - 1566). Hong also admitted that when he later became employed by Level 8, he did not design anything pertaining to the fall 2009 Tumi line. Level 8 did not produce a fall 2009 Tumi line.
In an email dated December 6, 2008, Hong wrote to Edelman expressing that he needed help from Edelman in putting together the Tumi 2009 lines, saying there were "a lot of things taking me away from my work * * * sorry to tell you now when we have no money, but I am going to have a breakdown soon" (pp 1621 -1624). 
About the "state of the union" meeting in February 2009 at Stuart's where they were made aware of the financial problems from Galvin, Hong said they were "encouraged" to find employment elsewhere. He said there was "a definite reality at the end that payroll was - - it was in jeopardy" (pp 1627 - 1631).
In his resignation letter dated February 24, 2009, Hong wrote, "[i]t has been a very confusing last days." He was asked to clarify that statement. Hong said, "[t]here were a lot of disruptions in the environment in which we worked. There were a lot of insecurities with payroll. There was a lot of confusion that we as a staff and people that worked with me were having, a lot of questions. There's a point where I was threatened for health and security at the workplace, and it was demoralizing and very confusing. . . . I realize that economically Stuart's is not going to be supportive of my work." Hong stated that he made the decision to quit on his own. Neither Kim nor Missy Moon had told him to quit but Galvin did advise him to seek employment elsewhere (pp 1631- 1634).
Hong and Edelman never had a formal meeting at which they talked about the formation of a new company. He went on to say "not a formal meeting, per se, but when I presented to Mr. Edelman that I received an offer from G-III in early February, end of January, early February of '09, he commented to me that it probably would be in my best interest that I stick around. Now, at the time I wasn't sure if he was alluding to a new venture or if he was alluding to the fact that Stuart's would become healthier financially, but that's the earliest that I could remember him hinting of a new venture" (pp 1644 - 1645).
Although Hong resigned from Stuart's on February 24, 2009 and was thinking of leaving Stuart's before that date, he attended the Las Vegas show earlier that month on behalf of Stuart's. At the time of the show, he was aware that Stuart's was having financial problems. Hong went to the Las Vegas show "to explain the imported Italian fabric and their attributes. . . . There were a lot of technical explanations and attributes that we needed to highlight to aid sales." He said he was not involved in sales nor did he take purchase orders at the show. He reiterated that he was in Las Vegas to represent Stuart's, although he did intend to leave Stuart's at that time (pp 1681 - 1683). He claims that he did not know on February 24th that Level 8 was already formed and he did not recall having a meeting with anybody about forming Level 8.
Hong testified that he returned to Stuart's two times after his resignation: the first time to return his keys and to take his radio and "bobblehead of Obama"; on the second visit, he helped Edelman "move furniture." He had no recollection of anyone else being at Stuart's or of removing garment racks, valise or samples from the offices (pp 1606 - 1609). Later, he was asked about an email dated February 27, 2009, in which Galvin wrote to Edelman, "[e]vidently, with you and Michael cleaning out our offices and the removal of proprietary Tumi information such as samples, designs sheets, tech packs, etc., the reality of the situation is very clear." However, Hong only recalled that on a Sunday: "I remember desks, chairs perhaps, but I distinctly remember a magazine rack . . . vintage newspaper racks. . . we took them to the vehicle that Mr. Edelman brought to move" (pp 1694 - 1695).
Hong gave the following reasons for his decision to leave Stuart's:
First reason, the state of the union addresses clearly pointed in the direction of the company failing, in which the employees wouldn't be paid at a certain time in the near future. It was more than once that the state of the union addresses happened. As it got closer to January and February of '09, the sum and substance of these meetings were more encouraging to find jobs elsewhere. That was one issue.
The other issue was the closer it got to February 24th there was a kind of an unknown element in the office. I was told that - - I was told to watch the front door, lock the front door because there is a possible retaliation of a criminal element because the monies that were borrowed to run the business were borrowed not properly and there might be some payback or violence that may happen in the office. That was a big proponent of me leaving. I couldn't protect myself or my staff, my design staff, and I felt uneasy.
The third thing was the sporadic and - - just the negativity and exhaustive negativity in the office of Mr. Galvin when he was there. There was a lot of door slamming, yelling, and it really reduced morale in the office, and the environment became very toxic. It was not an environment that I chose to stay (pp 1687 - 1688).
Hong was not sure of precisely when he started working at Level 8 after leaving Stuart's. During his depositions, he changed his answer three times in this regardfrom one and a half months to two weeks, to several days. At trial, he testified that: "as I said in my deposition, six and a half years ago, I wasn't one hundred percent clear with the sequence and the timing of when I started my employment at Level 8. So if I had to guess, it has to be a week" after leaving Stuart's (pp 1596 - 1603).
Hong was given a 7% profit-sharing interest in Level 8. Hong never had a discussion with anyone concerning an ownership interest in the company; it was his understanding that the 7% percent (which he would be getting) was "profit sharing." Hong was asked "what does that 7% mean to you, how was it supposed to work?" He replied, "[i]f and when Level 8 had profit above and beyond costs of goods and if they had a new profit, then out of that net profit I would receive 7%, as a bonus to me" (pp 1646 - 1651).
Hong was unaware of a sale to Aeropostale in October 2009, which generated income of $249,000 that was supposedly distributed to Mr. Kim, Edelman and him (pp 1603 - 1606).
Hong was shown a document entitled Minutes of Meeting of Board of Directors of Level 8 Apparel, LLC which lists the president as Missy Moon and Hong as secretary. The document refers to a meeting held on February 18, 2009. Hong agreed that the document did include his signature and also that date was prior to his resignation from Stuart's. However, he never went to any such meeting. In this regard, Missy Moon asked him to sign the document which he initially refused to do but finally relented after being asked several times and refusing. Hong said Missy Moon "stressed more on the lack of people at Level 8 to sign the document, therefore, by default I was kind of the only one to sign a temporary secretary role in which I had, she explained, to do nothing." To the best of his recollection, Hong signed the document six months after the formation of Level 8 (pp 1640 - 1643).
Hong and Edelman, on behalf of Level 8, were present at a meeting at Tumi corporate offices on March 16, 2009. At the time, Hong was working with design staff "brainstorming Spring 2010." Hong testified that he did not know what company had the Tumi license at that time (pp 1616 - 1620).
Hong testified that he was an employee of Stuart's but never became an officer or director of Stuart's and never was involved in its management, operational, or financial decisions. Hong also testified that he never disclosed any information in violation of the non-disclosure agreement signed with Stuart's (pp 1653 - 1655); never sent an email to Stuart Edelman asking him to pressure Galvin to either step down from the company or leave the company; and had no knowledge of buyout offers (of Galvin) (pp 1680 - 1681).
Testimony of Frank Spadaro
Mr. Frank Spadaro, currently employed at Level 8 as President of Sales, testified that he has worked for Level 8 since August 2009 when he was hired in a sales position by Sam Kim. He was hired to "get a more moderate priced brand to sell to other department stores other than their current distribution." He said that when Level 8 signed the lease for the third floor for the Haggar business, he personally guaranteed it. He testified that the Level 8's gross sales for 2009 were $1,107,335, which was solely attributable to Tumi sales. In 2010 and 2011, Haggar did sales of approximately $2.3 and $2.4 million and roughly $300,000 more in 2012. The Haggar license expired in 2012. Spadaro said he was later involved in negotiating a lease for additional space on the fifteenth floor, which he also guaranteed (pp 1736 - 1747).
[*21]Testimony of Missy Moon
Missy Moon testified that she worked for World Class before she became an employee of Level 8 in 2010. In her position with World Class and Level 8, Missy Moon responded to Kim's emails, on Kim's behalf and as per his instructions, because Kim made major decisions but din not have a computer (pp 1755 - 1759).
Moon had known other Level 8 employees including Edelman, Hong K.K. Park and Jennifer Barone when they were employed by Stuart's (pp 1760 - 1766).
Moon was aware of the arrangement in 2008 that Stuart's entered into with World Cross for the Aeropostale manufacturing, in which World Cross Culture would do the manufacturing, pay for the manufacturing and the freight, and pay Stuart's a commission, which was 8.3% of the selling price (pp 1767 - 1771).
Moon testified that in 2009, Kim advised her that he was forming a new company called Level 8 and asked her to check if the name was available. After confirming the name's availability, she asked the accountant for the company, Sin Ho Kim, to file the Articles of Organization. Moon said she was given four names of participants in the company, some from Kim and some from Edelman. The document included social security numbers and addresses. Moon believed that she gave this document to the accountant (pp 1772 - 1782). Moon said that no one specifically told her that the participants would be stockholders, although she typed the word "stock" on the document. However, Kim had used the word "shares" and she misunderstood that to mean stockholders. Moon said that Kim "clearly mentioned profit sharing, but I just heard sharing" (pp 1831 - 1836).
Initially, because Level 8 did not have a bank account, both Lister and World Cross each deposited $30,000 into the WCC's account. Moon agreed that when checks were written on behalf of Level 8, they were deducted from the $60,000. The first check, recorded on February 6, 2009, was to Stuart Edelman for $2,000. She wrote "Level 8" on the document to help keep the records separate, although, it was not a Level 8 expense. Moon did not know why three checks in the amount of $2,000 each were issued to Edelman although they would not have been issued without Kim's approval (pp 1784 - 1804).
Moon also identified several checks that were written to various companies such as Health Insurance Plan, Business Journals, Classic Coffee Systems, etc., all of which represented payments made on behalf of Stuart's (pp 1841 - 1848).
When Moon was shown a document in her handwriting which said "Wayne's health insurance should be terminated," she identified it as a memo and said that she was not sure whose decision it was to terminate Galvin's insurance (pp 1806 - 1807).
Moon testified that she signed the document entitled "Minutes of Meeting of Board of Directors of Level 8 Apparel, LLC." After Kim told Moon that she would be president and Hong would be secretary, she asked Hong to sign the minutes, as was required in order to obtain a new factor. She confirmed that Hong hesitated but then signed. Moon did not show Lister this document although she was aware that he had signed documents on behalf of Level 8 and had guaranteed the Level 8 lease (pp 1855 - 1857).
Moon testified that although the document said that the first meeting of the board of directors was held and the directors were present, those statements were false. Also false were [*22]the statements in the document that "[i]t was moved, seconded and unanimously carried that Kukja Kim as temporary chairman and that Michael Hong acts a temporary secretary," as well as statements about the election of officers. Moon admitted that the document was prepared so that Level 8 could borrow money from a new factor and that Kukja Kim's [Mr. Kim's wife] signature was actually signed by her (Moon) but with Kukja's knowledge (pp 1808 - 1814).[FN9]

In an email to Hong, Edelman and Moon (on behalf of Kim), Lister wrote "[t]he last and maybe the most important item is the discussion with Sam Kim regarding the sharing of the next $300,000 between him and I. I really have a problem. We are short every chargeback taken by Aeropostale. The agreement with Capstone was written in such a way that they would be paid for every penny regardless of charges, shortages and anything else. That left Stuart's short of 250 plus in funds that are owed to Merchants. Sam filled a great part of that with an advance of some $100,000. But, now . . . I can not get my money from Merchants because they are looking for at least $100,000 that Aeropostale deducted in one lump sum because of the delivery to the West Coast because of lateness." In the next paragraph Lister suggests that "Sam honor the chargeback but instead of having to come up with the whole amount to give to Merchants, where it is due, replace by $30,000 monthly for the next five months." Moon replied on behalf of Kim, saying "I fully understand your situation but I cannot accept your proposal as I talked to you before" (pp 1814 - 1822).
In regard to chargebacks, she said that World Cross received a chargeback notice from Aeropostale but Aeropostale never asked World Cross to pay because it deducted the amount from what was owed to World Cross.
Moon acknowledged that she gave prior testimony to the effect that in early 2009, World Cross owed money to Stuart's, though she wasn't sure of the amount. She said the money was for commissions, but because of the deductions by Capstone, World Cross didn't have the money readily available to pay Stuart's (pp 1869 - 1870).
Regarding WSG's crossclaim against Lister, Moon testified as follows: It was her understanding that Merchant Factors was the factor to Level 8's Tumi business but that it never released any money to Level 8. Moon was asked about a document that she prepared which indicated that Level 8's total sales from Tumi for Level 8 from August 2009 to January 2010 was $1,116,600.64. Level 8 did not receive any of those funds from Merchant Factors. She was then asked to look at another document which was for duty and freight paid by WSG and then another which was for goods related to this assigned invoice. The duty and freight was $120,250.73 and the cost of goods was $459,776.39 with $580,036.12 being credited to Lister. She was then shown a document entitled "Investment Status" which was a record of Lister's contributions to Level 8. This included money contributed directly and monies paid to vendors directly for Level 8. The document indicated $276,864.92 had been credited to Lister/WSG. In yet another document entitled "Expense paid by Level 8 from Peter's portion," Moon said "[s]ince we never [*23]received any money from Merchant Bank * * * all the expenses [are] related to the sales for that assigned invoice. So those expenses [were] supposed to be paid from those one million dollars." She indicated that she "put 100% of those expenses to Mr. Lister's account?" and deducted the number from $1,116,600.64, which left a balance that Lister owed of $564,927.10 (pp 2258 - 2266).
In regard to an email from Lister to Moon and others, dated July 29, 2010, Moon said, "Mr. Lister did not agree . . . with those figures." Lister wrote "we have serious disagreements with the following items. . . . You calculate dollars to PL or WSG at 20%. I believe I calculate at 31%." Moon testified that Lister was referring to the profit sharing and "that profit-sharing percentage was reduced from 31% to 20%, which I remember." She went on to say "Mr. Kim told me that Peter Lister's portion profits sharing portion, supposed to be 20%" (pp 2280 - 2284).
Testimony of Sam Kim
Seung Bong Kim, also known as Sam Kim, was in the business of importing and "sourcing", which he explained as facilitating the overseas manufacturing of merchandise for import (pp 1899 - 1903).
Kim testified that he has known Edelman for many years and that Edelman worked from Kim's office before he went to work at Stuart's. At some point in 2008, Kim met with Edelman who asked for his help. Kim thereafter became involved with Stuart's in 2008, doing production for Stuart's and arranging financing for the Aeropostale manufacturing.[FN10]
Kim said that to accomplish this he had an arrangement with a factor named Capstone, which helped finance the manufacturing of the Aeropostale merchandise (which he also shipped). This arrangement involved paying a commission to Stuart's (pp 1904 - 1910).
Kim said that it wasn't until his deposition that he learned Galvin owned a percentage of Stuart's. Kim was shown an email from Edelman dated December 10, 2008, which said "I have spoken to Sam, and he is here in the office almost every day when in New York * * * and he also can see that Wayne has a negative impact on the business." Kim responded that he "never had time to visit that office that often" and denied making any comment about Galvin or saying that Edelman "should get rid of Wayne" (pp 1910 - 1919).
At some point, Kim met with Edelman, Lister and Hong about the prospect of doing business together. They talked about how they "would share the profits" (pp 1921 - 1925).
When Kim was asked if he had offered to give Edelman $100,000 to assist in "buying out" Galvin, he said "I don't remember." In an email dated March 6, 2009, Edelman wrote to Galvin "after last nights meeting with Sam, and yesterday with Peter, to finalize all the pending details with you, here is the proposal." But Kim did not remember such a meeting and denied offering to give a promissory note and guaranty to pay Galvin (pp 1925 -1930).
Kim was asked about a document called the "Daily Balance" and specifically "[d]o you have a recollection in February of 2009 that World Cross Culture, was paying some of the Stuart's bills?" He answered, "it's a commission. . . . When we were doing business with Aeropostale, as far as I remember, we owed little bit of commission" (pp 1934 - 1941).
On March 17, 2009, he heard that because Stuart's was unable to make required payments to Tumi, its license would be terminated and awarded to Level 8. Kim did not attend any meetings in March of 2009 and did not ever meet with Tumi. He was asked if he had known about Tumi issuing a new license or amending the current one when he was overseas at that time. He said "I received telephone messages." When asked if he had asked Tumi to default Stuart's, Kim responded "I never met them, so how could I?" (pp 1964 -1965). Kim said that Edelman and Hong negotiated the Tumi license for Level 8. He did not remember who designed the 2009 line that Level 8 sold (pp 1948 - 1952).
When asked if he knew Edelman arranged to have the customer name, vendor name, switched from Stuart's to World Cross so that after the switch Aeropostale became World Cross's customer, he said, "[w]e indicated that we will not - - we said we will not be financially responsible if Stuart's, LLC kept its name for Aeropostale. So we asked them to deal directly with [World Cross]." He was asked, "before you made the change Stuart's was getting a commission for all of the Aeropostale sales, right?" He said, "we helped them so that they would get commission. We were helping Stu Edelman" (pp 1953 - 1954).
Kim was shown a lease agreement that Lister signed on March 17, 2009. He testified that he was out of the country at the time the lease was signed. 
Kim testified that he was reluctant to get involved in Level 8 but did so because there were young people at risk of losing their jobs. The first conversations about forming the new company were with Edelman and Lister; Kim stated that he would be the owner. He indicated that he instructed Missy Moon to work on forming the company. Under the profit sharing agreement, Kim would get 31% of the profits, Lister 31%, Spiegel or Edelman 31%, and Hong 7%. When asked if Level 8 had ever given a share of profits to Edelman or to Hong, he said, "there was no profit given out, but I remember giving them bonus" (pp 1969 - 1977).
In an email dated November 4, 2009 from Lister to Missy Moon and copied to Edelman and Hong, Lister stated "when Sam reduced both Stuart's and my share of profits, which we agreed to because I could not finance half of the Haggar group, he did this going back to the beginning, February 1, 2009. He then owned 53% of the profits going into Level 8 from day one." Kim said he did not remember a conversation with Lister or Edelman regarding this email but agreed that the profit participation was going to change because Kim was bringing Haggar business to the company. 
When Kim was asked about the contributions of each party to Level 8, he said Hong's contribution was his experience with the project, Edelman's contribution was to be sales for Tumi, Lister was to be finance "but he didn't," and Kim's contribution was to be production (pp 1977 - 1980).
Kim paid some of Stuart's bills, including salaries for Stuart's employees, out of commissions owed to Stuart's. He was then asked, "if you paid the commissions to Stuart's they could have paid their own payroll?" He answered "common sense says yes, but they ask me to do it that way" (p 1997).
Kim was shown Stuart's Operating Agreement and asked if he realized that Mr. Galvin, according to the document, had 81% of the membership interests in Stuart's, LLC. He said, "[t]his is the first time I realize that." He was also shown the non-disclosure agreement from Stuart's, LLC. He said he did not recognize it and did not have knowledge of that agreement in [*24]2007, 2008 or early into 2009. Kim was shown the Aeropostale, Inc. Master Sourcing Agreement dated April 1, 2007 and again said this was the first time seeing it (pp 2003 - 2005).
Kim was shown a contract between and Level 8 that he and his wife had signed, in which Level 8 entered into a borrower/lender relationship with Samsung. Kim agreed that the factor prior to Samsung was Capstone. He was asked if anything changed in terms of how Level 8 conducted its business and earned revenues from the way it operated under Capstone to the way it operated under Samsung. He said it became "smoother". He also agreed that Level 8 earned commissions under Samsung explaining, "Level 8 will be in charge of production, service the buyers, and delivery of the items on time, and the quality of the items. The responsibility of Samsung would be to open the letter of credit for the merchant and help it passing the duty and the warehousing. And after that they will be responsible and they would make collection by using Samsung's name. And after paying off all the expenses and commissions, then they would distribute the profit to our company" (pp 2006 -2011). 
Kim was asked if it was World Cross or Level 8 that held the Haggar license. He responded "[w]hen there was agreement with Capstone factoring . . . it has to be under World Cross Culture in order to get the funds." In response to a question about the 2009 sales of $2.3 million for Haggar and whether the sales were made by World Cross Culture or Level 8, he said World Cross Culture had the license in 2009 but all the invoices were under Level 8 (pp 2012 - 2014).
Kim said that "after it was finished with Stu Edelman and finished with Peter Lister, after everyone was finished, that's when we started with Samsung." The court asked, "what do you mean by when everybody was finished?" Kim said "after they stop getting involved. . . . As far as I know, Stu Edelman stopped working in 2011 or '12. . . [when] I fired him. . . Under the contract with Tumi there is a clause that he was not supposed to sell to Walmart, Target and JC Penney. We were not supposed to sell to those stores, but Stu Edelman did. So I fired him" (pp 2014 - 2017).
Testimony of Howard Fielstein
Howard Fielstein, a partner in Citrin Cooperman and Company, is an accounting expert designated by Plaintiffs and qualified by the court (pp 2021 - 2026).
Fielstein was first retained on October 17, 2014 and was asked to quantify the damages that were incurred by Stuart's and Wayne Galvin as a result of the actions of the Defendants in diverting the assets, including business relationships and the Tumi license, as well as other items, to Level 8 and World Cross (pp 2026 -2027).
Fielstein testified that, "I calculated the damages aggregated to 7.7 million, which consisted of 4.9 million from Level 8 and 2.8 million from World Cross Culture, plus any interest and fees that are applicable." He explained the process as he said he calculated sales based on invoices for 2009 by World Cross to Aeropostale as $6,590,000 he then factored in the 8.3 % commission, explaining:
Now, I didn't have any other information that I was comfortable with relying upon, which I'll get to when we get to Level 8. So what I did was I calculated an increase, basically at [*25]the inflation rate, that each year the Aeropostale sales and the resulting commission would go up by a factor of 3% which, again, is the rate of inflation. It's a very, very, conservatively low number because, candidly, during the period of 2010 through '13 was a very strong period in sales of Aeropostale. So had the performance been better with respect to World Cross Culture and the Aeropostale engagement flourished, clearly there would have been more in the way of sales. But I took a conservative approach, basically keeping it, the number, reasonably flat going out to 2013.
I used a four-year period because it appeared to me that for the defendants to have gone through all the trouble of moving this particular relationship, as well as the other relationship, to World Cross Culture there had to be a period of time involved that they thought they would benefit from this particular contract. So I used a four-year period and then I discounted those monies back (pp 2027 - 2031)
With respect to damages arising out of the Tumi license, Fielstein stated that he looked at the tax returns and compared them to the Quick books starting in 2009 through 2012. Fielstein decided to use 2010 as his base, explaining:
So it became virtually untenable for me to be able to take these expenses and create a model to understand what the costs were relating to sales because it appeared to me that starting in 2011 the business model was changing for Level 8. So what I needed to do was find a stable base to work from, which turned out to be 2010. And similar to the other calculation, but specific for other reasons, I got that benchmark of 2010 and worked from increasing the sales and cost of sales by 3% and then the expenses that I was able to adjust for, which included sample expense, commissions and royalty expense, I utilized then numbers for each of those in the 2010 tax return and grew each of those numbers by 3% each year to again create a model.
* * *
So when I calculated out the gross profit, which brought me out to - - adjusted gross profit after the sample expenses, commissions, royalty expense, I come to a number of $5,128,664. And I present value that using a discount rate, again of 1.67%, I come to a number of $4,904,379 (pp 2043 - 2047).
Fielstein also calculated the damages award without reference to the Haggar account in case the court decided that the Haggar account should not be considered. He did this by subtracting the Haggar sales from the totals: "underneath the $5,851,670 in column 2010, total Level 8 sales. I would put a negative $2,300,000 to come to a new subtotal. I would create the cost of goods sold number based upon 34.6 % of that new net. I would reduce my expenses percentage-wise, so it all held together as an adjusted gross profit, and then the math would work." Fielstein was then asked "what would the loss be if the $2.3 million was eliminated, calculated to the present value of March 31, 2009?" He answered, "it would be $3,045,643" (pp 2047 - 2058).
Considering his original damage calculation for Level 8 of $4,904,379 with the World Cross calculation of $2,794,418, the total damages would be $7,698,797. However, if the [*26]amount was reduced based on the elimination of Haggar from consideration, the Level 8 loss would be $5,840,061 (p 2058).
Fielstein testified that he is paid $450 per hour and was paid more than $60,000 for his work on this case (pp 2060 -2061).
After Fielstein reviewed the other expert's report (Kursh's report), he revised one calculation: "I realized that even though royalty expense wasn't moving in any coordinated or in correlation to the sales revenue. I needed to have some factor in for the royalty expense. So that's why I made the correction. . . . The only other modification I made, in addition to the royalty expense, was I made the other expenses and royalty expense a little more clear by increasing each of them by 3% per year" (pp 2073 -2074). Fielstein was asked if he took into account the overhead of Stuart's and said "I could not . . . I didn't have any 2008 information, or even beginning of 2009. All those records were taken over, I understand, to Level 8, and no tax return was done for 2008" (pp 2080 - 2081). 
There was colloquy about the schedules of sales from Fielstein and Kursh. The 2009 numbers were the same from both reports. In 2010, Fielstein calculated $6.787 million based on an increase of 3% and Kursh calculated $3.3 million. In 2011, Fielstein projected an increase to $6.99 million (3% increase) and Kursh showed $491,000. In 2012, Fielstein projected $7.2 million (3% increase) and Kursh showed zero. In 2013, Fielstein projected $7.4 million and Kursh showed zero again. Fielstein said he was aware that Kursh was using actual figures from the invoices. Fielstein believed that his calculations were more accurate than Kursh's even though not based on the actual sales figures (which Kursh relied on) because of Level 8's poor performance in making late deliveries. "The performance, apparently, wasn't what it should have been and Aeropostale said they didn't want to do business anymore. So had the performance been what it should have been, presumably the relationship would have continued." He was asked about how he knew that Aeropostale did not want to do business anymore, he answered, "I don't know specifically, but since there were disputes that I read about in transcripts about late deliveries, wrong deliveries, wrong addresses, it sounds like since there wasn't an exclusive relationship they went elsewhere" (pp 2084 - 2087). 
When asked about chargebacks, and specifically a $979,000 chargeback from World Cross for the holiday season in 2010, he stated that even had he known of this document he would not have included it in his analysis (p 2091). Neither would he have factored the 8.3% commission into his calculation (pp 2091 - 2094). In addition, he also declined to use sales figures from Samsung in his calculations because of discrepancies with the tax returns: "[U]nder normal circumstances, yes. But when the internal documents don't agree to tax returns, then I can't trust any of the numbers that I'm seeing" (pp 2095 - 2098).
Fielstein did not rely on the actual tax return numbers because of reporting "irregularities". Significantly, "here the company is showing a gross loss, which is hard to understand because at the same time they've got payroll and fringes of $1,500,000 in 2012. So they basically are paying payroll equal to the amount of their sales, and that's not even included in their cost of goods sold. So the whole tax return is a big question" (p 2108). In response to further questions about his disregard of tax returns he said, "I had concerns because exhibit 114 showing 28 million of sales for the year, and apparently that was prepared by Samsung. So Samsung believes that Level 8 had sales of $28 million, but the company itself only thought they [*27]had sales of $8 million." He was asked several times why he didn't just adjust those figures. He said, "I'm trying to get past the first number, which is 28 million in income, in sales, not including commission income." Later he said, "per the tax return there's $1,693,609 in sales and commission income of $6,800,692, for a total of $8,494,000, or a difference in revenue of $23 million. I don't know how to reconcile that" (pp 2104 - 2110).
Thus, projections were more accurate than the numbers relied on by the defendants, who disagreed.
When asked why he used 1.67% discount rate, Fielstein said:
It depends what the purpose is. The term discount rate, as used here, is really just the rate that I used to discount the future cash flows for calculation purposes. It wasn't to value a company. It wasn't to entice an investor to get over a certain hurdle rate. It was only to use a calculation to get back to present value using some semblance of a benchmark index number. So I used a five-year treasury. But I didn't use that because I was trying to find a risk-free rate to use. I used it just as a comparative percentage to use that had some basis in reality.
Fielstein rejected Kursh's higher discount rate as inappropriate (pp 2101 - 2102).
He was asked if the relationships he was factoring were at risk would he have used a higher number, he said:
No, because I computed that - - I took that into account when I went with the 3% growth rate, because the business relationships created here should have resulted in far greater growth rates per year, despite what the actual results may or may not show, again, despite what I see in exhibit 114, putting that aside for the moment where it was showing very significant sales. But the fact that I used a benchmark treasury rate, which can be viewed as a risk-free rate, well that's really taken care of by the fact that I used such a low growth rate for the top part of the equation. If I used a much higher rate, then that would have created a more risky situation, but the fact that I only used an inflation-based 3% rate gave the ability to use a lower rate, which is the benchmark rate (pp 2110 - 2114).
Fielstein stated "I built my model based upon what occurred in 2010 and grew it out 3%, because I couldn't make any sense of the numbers that were occurring in the tax returns, so I didn't use the commission information in my calculation" (pp 2114 - 2115).
Testimony of Samuel Kursh
Samuel Kursh testified on behalf of the Level 8 and World Cross Defendants. Kursh is director of BLDS, LLC, which provides economic and statistical analysis services. He is responsible for the economics aspects of the company's practice. Kursh was qualified as an expert in forensic economy valuation (pp 2127 - 2133).
Kursh reviewed Fielstein's report, documents, invoices, contracts, annual commission reports, and depositions. He testified that his hourly rate was $475 and that he had billed [*28]approximately $50,000 (pp 2133 - 2137).
Kursh disagreed with Fielstein in several respects:
I don't know what he was doing. He conflates lost profits with disgorgement, and the two things are different. And then, after you realize that, you realize a lot of other things, or his main focus, his main method, is incorrect if disgorgement is the remedy and it's incorrect if lost profits are the remedy.

 * * *


It's incorrect if lost profits are the remedy because, if you're looking at Stuart's lost profits, then the discount rate one would need to use has got to be significantly higher. So if you're looking at Stuart's lost profits, what you are essentially doing is taking the revenues from Aeropostale and Tumi and you're assuming that Stuart's would have had those revenues and the associated costs, which creates a really interesting issue in this case because Stuart's no longer existed at that time.

 * * *

If you move to the idea of disgorgement - - disgorgement is a measure of what actually happened, the benefit gained from the alleged wrongful acts. Now it appeared that he was kind of doing that, but then he didn't use the real data, which was available (pp 2138 - 2139).
With regard to the Fielstein report, Kursh said there were several comments that he found troubling or puzzling. In a statement that said Fielstein would "testify regarding the damages incurred by the plaintiffs, and the amount of profits that should be disgorged" Kursh said "damages incurred by the plaintiffs implies that Stuart's had the business and sustained an economic loss * * * [but] you don't disgorge profits, per se, because you have to look at the whole picture here. It's not just profits." In response to Fielstein's statement of "the damages will be measured by the amount of lost profits resulting from the conduct of the defendants," Kursh commented:
Lost profits to who or what? And that seemed to me to say he was looking at Stuart's lost profits, particularly because he says lost profits is defined as lost revenues less variable associated costs. That's kind of the classical definition of lost profits. It's slightly incorrect because it really ought to be lost revenues less avoided costs, the costs that you did not incur by not having the sales. Of course, the interesting issue in this case is Stuart's avoided all costs because they were no longer in business (pp 2139 - 2140).
Kursh was asked if he looked at both lost profits and disgorgement in analyzing the Fielstein report:
I pause because you kind of end up in a similar place, but for the discount rate. And it's not necessary to get into the nitty-gritty of the expenses that would have been in the event Stuart's - - you're doing Stuart's lost profits, or that actually are or were, if you're doing a disgorgement model here, because simply looking at the correct revenues, the correct sales revenues, the actual sales revenues, and looking at the commissions that would be [*29]paid to get the revenues, or that came in, and costs that are clearly related to the sale of Aeropostale particularly, you end up with either negative numbers or very small positive numbers (pp 2142 - 2143).
Kursh testified that Fielstein's model for calculating Aeropostale's sales was essentially the same that he used. He said Fielstein had actual data for 2009 and then annual increases of 3%. Kursh also used the data from 2009 and used real data from actual sales—not projections- for the years 2010 through 2013. Kursh testified that he and his colleague went through the entirety of the production via subpoena from Aeropostale. Kursh said he reviewed all the invoices because "I saw the projections that Mr. Fielstein did and I said: how can he be saying six, seven, million, when it's clear that the number starts at 6.59 and then just goes down and disappears. And I wanted to be sure that we didn't miss something" (pp 2143 - 2146).
Kursh testified that his 2009 number for Aeropostale sales of $6.590 million is the same number that Fielstein used. In 2010, the figure was $3,310,302 and in 2011 it was $491,108, then nothing for 2012 and 2013 because there were no invoices reflecting any sales during these years. Kursh said that the next step in this process was to examine how much revenue would have actually flowed to World Cross as a result of the Aeropostale sales, which he calculated at 5.3% (pp 2146 - 2150).
In correspondence from Aeropostale stating "upper management has reviewed the final recaps of late outerwear deliveries for holiday 2010. We are asking for compensation of $979,733.51 from you. This is half the total margin dollars lost due to the lateness of your product." Kursh said that he deducted $979,734 from the 2011 sales which reflected this chargeback from Aeropostale. Kursh later admitted that the chargeback could have been deducted from the 2010 lost profits. The court here notes that moving the chargeback to the year of the late deliveries would substantially change the outcome of the lost sales total. Kursh's calculations for the total Aeropostale Lost sales came to negative $428,988.00, whereas if the chargeback had been deducted in 2010, the lost sales would come to $498,819.00.
Kursh presented the lost sales for Aeropostale as $349,271.00 for 2009, $175,446.00 for 2010, minus $953,705.00 for 2011, and he indicated there were no sales for Aeropostale in 2012 and 2013, with a total lost sales of minus $428,988.00.
Kursh said he did an analysis of Stuart's financial condition as of February of 2009:
I was confused by Fielstein's report as to whether or not he was arguing that Stuart's would have had the sales, or the disgorgement remedy was the appropriate remedy. And so I just wanted to see could Stuart's had had the sales.
As I said earlier, there a very interesting twist to this case because most of the time in this kind of situation both companies still exist and so you can see what the overheads are and other costs. In this case Stuart's avoided all costs because they stopped operating. And so, even if you use disgorgement as the remedy, even if you assume — rather — even if you assume that they would have had the sales, you'd have to subtract all of the costs away from it, those sales, because none of those costs were incurred.
If you were to give a disgorgement remedy and not use full costs you are creating an incredible windfall to, in this case, Stuart's because had they had the business they [*30]wouldn't have made anywhere near the kind of money that Mr. Fielstein is claiming the disgorgement to be. And in fact, it appears that even if they had the business, they wouldn't have made any money because the cost of doing business is just simple, direct costs for WCC and Level 8, gives you negative numbers (pp 2156 -2157).
The court asked Kursh "isn't that one of the reasons why you have a 20% discount rate?" Kursh said, "it would be highly risky." The court asked, "in other words, you're using that higher discount rate because [of] that other issue you're talking about, the entire cost of goods sold. You're trying to reduce it to a real number." Kursh responded:
Not exactly, your honor. Discount rate represents the rate of return that an independent third-party would require to invest in that asset. In this particular case if you assume Stuart's is a going concern and someone were to say: for me to invest in Stuart's to do the Tumi business or the Aeropostale business, what rate of return must I have? Considering Stuart's history, the general nature of the apparel industry, which is highly risky, I'm saying 20%. It's probably 30, but it's 20%.
So what you're doing is you're saying, OK, if you assume Stuart's, or the plaintiff, then the cash flows that would come from this are highly risky and you pull them out and that's the discount. That's what you're doing with the discount rate.
Concerning his calculations to discern the lost profits for Tumi/Level 8, Kursh used several methods of obtaining the yearly sales. For 2009, he assumed all sales were for Tumi. Using the total income for 2009 of $1,107,634.84 and deducting the expenses from the income, he calculated negative $308,255. In 2010, Kursh based the sales amount on the royalties paid to Tumi, instead of the tax return figures, because there were sales other than Tumi that year. Based on those figures, the net income for 2010 is negative $318,808. The following year, Level 8 changed factors and the entire business model changed. Kursh said if he had calculated 2009 and 2010 using the new Samsung business model, the numbers would have changed and would instead be about $10,000 profit for 2009 and $15,000 profit for 2010 (pp 2171 - 2175).
In regard to Tumi, Kursh was asked to speak about several documents. One of the documents was the Level 8 Apparel commission status for 2011, 2012, 2013. He explained their significance as "show[ing] the revenues that Level 8 would have received from the Tumi sales . . . . [T]his is an independent third-party providing data on what Level 8's revenues - - in this case from commission - - were. Not would have been, were." When asked about Fielstein's decision to refrain from using the figures in these documents because of discrepancies with the tax returns, Kursh commented that "you're trying to look at the actual data relating to Tumi sales. The tax returns, the financial statements, do not segregate that data. They are not helpful in trying to understand what the revenues, commissions, etc., associated with Tumi to Level 8 were. They're just not relevant." When asked if they show costs associated, he replied "yes. . . they take you down to a gross margin . . . and they apply other costs - - in this case Samsung's overhead - - and you can see what Level 8 commissions earned are" (pp 2159 - 2163).
Regarding Samsung's relationship with Level 8, upon reviewing their agreement, he concluded that Level 8 "was essentially a commissioned salesperson. . . . It's clear that when [*31]Samsung came into the picture that the business model changed. If you look at Level 8 tax returns, for example, for '09 and '10, that is apparently a different business model because they're eating some of the costs, which apparently were now being eaten by Samsung" (pp 2163 - 2164).
Kursh was asked to explain how he did his calculations for 2011, 2012 and 2013. He testified that he used the commission reports and eliminated non-Tumi products such as private label and Haggar. He then considered commissions less the royalties to arrive at a total. He had a schedule of royalties paid to Tumi for 2011, 2012 and 2013. Kursh said that commissions were: 2011 - $133,392; 2012 -$44,950; and 2013 - $1,876,290. He then deducted the royalties to yield the following: 2011 - negative $213,826; 2012 - negative $1,090,641; and 2013 - plus $1,459,995 (pp 2164 - 2167).
With all these calculations, there is a total of $180,000 disgorgeable benefit from the Tumi products (p 2176).
Kursh was then asked to give his net number for World Cross Culture and after doing some calculations, testified that negative $428,988 was the disgorgeable negative net profits for World Cross (p 2177).
Kursh disagreed with Fielstein's use of a 3% growth rate based on inflation stating that the inflation rate in the apparel industry was 1.2% for the five year period in question. He was also asked about Fielstein's use of "mid-year convention" and said "in the apparel industry the bulk of your cash flow is at the very end of the year. So you wouldn't use the midpoint. You'd probably use end of the year. I used end of year. But the midpoint is incorrect in this industry" (p 2179).
Kursh indicated that Stuart's was in default of the Tumi license agreement and lacked financial wherewithal. However, when asked if he knew that Tumi had agreed to waive the default of Stuart's in this time period, he said "no" (pp 2190 - 2198).
In connection with the $979,733.51 chargeback from Aeropostale, Kursh considered that amount in his calculations, although the chargeback was caused by late deliveries and poor quality of Level 8's work (p 2210).
Kursh was asked if his calculations for Tumi considered damages from any sales other than from Tumi product, and he answered "no. . . because while Fielstein doesn't say this, at the time the only relationships that existed were Tumi and Aeropostale." When asked if he was aware that Stuart's had a private label business and that it was taken over by Level 8 in 2009, Kursh answered "there is no data - - that I have seen that allows me to say that the private label business from Stuart's was transferred to Level 8 or WCC" (pp 2215 -2216).
CAUSES OF ACTION
Initially, application to conform the pleadings to the evidence presented at trial is granted (CPLR 3025[c]).

First Cause of Action- Breach of Operating Agreement Against Stuart Edelman
The Plaintiffs assert that Edelman breached the Stuart's Operating Agreement which [*32]stated:
Paragraph 10. Management of the LLC
10.1 The business and affairs of the LLC shall, except as otherwise required by law or expressly provided by this Operating Agreement, be operated and managed by Galvin (the "Manager"). The Manager shall have full and exclusive power and authority to manage and control all business and operations of the LLC in his sole and absolute discretion. The Manager shall be the sole person with the power to bind the LLC except and to the extent that such power is expressly delegated in writing to any other person by the Manager and such delegation shall not cause the Manager to cease to be a Member or the Manager of the LLC. The Manager shall have the right, power and authority, in the management of the business and affairs of the LLC, to execute all documents or instruments, perform all duties and powers and do all things for an on behalf of the LLC in all matters necessary, desirable, convenient or incidental to the purpose of the LLC. The expression of any power or authority of the Manager in this Agreement shall not in any way limit or exclude any other power or authority which is not specifically or expressly set forth in this Agreement.
Plaintiffs allege that Edelman breached the contract by (a) misrepresenting to Stuart's customers (including Aeropostale and Tumi) that he was the Managing Member of Stuart's with the ability to bind Stuart's to business deals; (b) misrepresenting to Stuart's customers that Stuart's was merely changing its name to Level 8 to induce Stuart's customers and licensees to switch from doing business with Stuart's to doing business with Level 8; and (c) binding Stuart's to new business deals with Stuart's customers and licensees that resulted in those customers and licensees switching from doing business with Stuart's to doing business with Level 8 (Plaintiffs' Pre-Trial Memorandum of Law at p 2 - 3).
Plaintiffs assert that Edelman is liable to Galvin for damages in the amount of $6,806,242.29, plus interest, costs and disbursements (Plaintiffs' Proposed Findings pp 28 - 29).
Defendant Edelman argues the following:
All of the various management decisions were with the knowledge and consent of Galvin who ceased being involved in the business, at a time when the business was insolvent, turning over the daily operation to Edelman, including but not limited to the sales, buying, finance and administration (Edelman's Post-Trial Submission at p 1).
"No assets of Stuart's were transferred to Level 8; as the Tumi licensing agreement was not an asset of Stuart's as it was terminated by Tumi earlier. The business relationship of Stuart's with Aeropostale . . . was always based on a single order and the performance of fulfilling that order, including but not limited to the party being able to finance and execute the purchase order" (The Buyers Sales Contract). In other words, each and every order was an individual contract (Edelman's Post-Trial Submission at p 1).
Stuart's LLC was a bankrupt company, and contrary to the testimony of Galvin, Edelman had made plans and offers, both oral and written, to compensate Galvin (Edelman's Post-Trial [*33]Submission at p 1).
The Court's Determination
The court finds and concludes that Edelman breached the operating agreement by acting in contravention thereof, and in excess of any purported delegation of authority, and, specifically by acting against the interests of Stuart's, by virtue, inter alia, of his misconduct with respect to the Tumi and Aeropostale accounts, in attempting to transfer clients/accounts to World Cross and Level 8, and in conspiring with the co-Defendants to accomplish these ends and to hasten the demise of Stuart's. Stuart's is awarded damages in the amount of $719,064, with interest from September 1, 2009. In view of the financial difficulties faced by Stuart's and the unlikelihood that it would have continued in business, the court concludes that only the lost profits from 2009 constitute an appropriate measure of damages. In this regard, the court notes that Stuart's, from the outset, struggled with monetary shortages, was severely affected by the unexpected delay of the initial Tumi order and by the economic downturn affecting the economy beginning in 2008. Moreover, Galvin acknowledged the financial instability of Stuart's and its likely cessation of business in early 2009. 
Second Cause of Action - Breach of Fiduciary Duty Against Stuart Edelman
Plaintiffs assert that Edelman breached his fiduciary duty by: (a) failing to inform Galvin that he had a $2.7 million judgment against him for fraud by his former employer, Gordon & Ferguson; (b) secretly meeting and communicating with the other Defendants and conspiring with them to steal Stuart's from Galvin; (c) forming Level 8 for the purpose of competing with Stuart's (d) secretly meeting and communicating with Stuart's customers, including Aeropostale, and with Stuart's licensee, Tumi, misrepresenting to them that Stuart's was merely changing its name to Level 8, and convincing them to stop doing business with Stuart's and to start doing business with Level 8; (e) physically removing from Stuart's offices all of its computers, clothing designs, clothing samples, customer lists, vendor lists, bookkeeping records, and other corporate documents and brought them to a new location where Level 8 was doing business; (f) convincing Stuart's employees to resign from Stuart's on the same date and to immediately go to work for Level 8; and (g) leaving on "short notice" to become a founding member and employee of Level 8, which directly competed with Stuart's.
Plaintiffs state that "officers of a corporation and business partners stand in a fiduciary relationship to the corporation, owe their undivided and unqualified loyalty to it, and must consider the other partner's welfare and refrain from acting purely for private gain" (Yu Han Young v Chiu, 49 AD3d 535 [2d Dept 2008]); Reiff v Shifrel, 268 AD2d 514 [2d Dept 2000]) and that a breach of fiduciary duty occurs when an employee secretly forms a company for purposes of competing with his or her employer's company, solicits the employer's customers, and diverts business from the employer (A & L Scientific Corp. v Latmore, 265 AD2d 355 [2d Dept 1999]; Gomez v Bicknell, 302 AD2d 107 [2d Dept 2002]). Diverting assets to a secretly created competitive organization, as Edelman did, constitutes breach of fiduciary duty (Yu Han Young, supra; Graubard Mollen Dannett & Horowitz v Moskovits, 86 NY2d 112) as does disclosing [*34]information to a competitor that then uses the information to divert work to itself (CBS Corp. Dumsday, 268 AD2d 350 [1st Dept 2000]). Plaintiffs add that the business judgment rule does not protect a fiduciary when he makes a decision affected by inherent conflict of interest (Pokoik v Pokoik, 115 AD3d 428 [1st Dept 2014]) (Plaintiffs' Pre-Trial Memorandum of Law at pp 7-9).
Plaintiffs assert that Edelman is liable to Stuart's in the amount of $5,840,061 (Plaintiffs' Proposed Findings p 30).
Defendant Edelman argues the following:
Stuart's had no assets to transfer, only burdening liabilities. Galvin gave Edelman the authority to run the daily business operations, including the financial decision-making ability. Galvin surrendered authority after he felt he could not make those decisions on his own at a time when the company was on the brink of bankruptcy and after which he ordered Edelman to notify all the employees to find other employment, notify Tumi that Stuart's would not be able to continue and to start the winding down the business and liquidation (Edelman's Post-Trial Submission at p 1).
Edelman asserts that testimony at trial shows that no assets of Stuart's were transferred without the knowledge of Galvin and, therefore, the damages alleged should be dropped (Edelman's Post-Trial Submission at p 1).
The Court's Determination
"The elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct" (Stortini v. Pollis, 138 AD3d 977, 978-979 [2d Dept 2016]). The court finds and concludes that Edelman was a member of Stuart's, that he "managed" Stuart's (for a time) as stated by Plaintiffs and admitted by Edelman, and, under the circumstances, owed a fiduciary duty to Stuart's and Galvin, which he breached by his conduct, including, inter alia, conspiring with others to form a competing business and wrongfully attempting to transfer clients/customers/licenses to competing entities against the best interests of Stuart's (see LLC § 409; Kalikow v Shalik, 43 Misc 3d 817, 826 [Sup. Ct. Nassau County 2014]). Plaintiffs are awarded damages in the amount of $719,064, with interest from September 1, 2009. In view of the financial difficulties faced by Stuart's and the unlikelihood that it would have continued in business (as discussed above), the court concludes that only the lost profits from 2009 are the appropriate measure of damages.
Third Cause of Action- Breach of Non-Disclosure Agreement Against Michael Hong
According to Plaintiffs, Hong breached the Non-Disclosure Agreement by disclosing and using proprietary information and trade secrets when he went to work for Level 8 and by failing to return documents that contained proprietary information to Stuart's. They state that the "striking similarity in style and appearance of Level 8's clothing designs to Stuart's clothing designs when Level 8 was using Hong as their designer, is proof that Hong improperly used, even if by memory, Stuart's proprietary clothing designs" (Plaintiffs' Pre-Trial Memorandum of [*35]Law at pp 5 - 7).
Plaintiffs assert that Hong "facilitated Level 8 in taking full advantage of Stuart's investment of time and money to create the fall 2009 line of outerwear. Hong is liable to Stuart's for the loss of profits from the 2009 line earned by Level 8 in the amount of $175,375 together with interest, costs and disbursements" (Plaintiffs' Proposed Findings p 29).
According to Plaintiffs, Hong's trial brief misapplies case law regarding restrictive covenants/anti-compete clauses. Plaintiffs assert that with respect to a cause of action based on violation of a non-disclosure agreement, a plaintiff need only demonstrate that it maintains confidential information, that the defendant had access to that confidential information, and that the defendant used that confidential information in breach of the agreement not to disclose it (COMGroup Holding LLC v Greenbaum, 2013 WL 235 6291 [Sup Ct New York County 2013]). Also, when a plaintiff, as here, expends considerable time and effort cultivating a business relationship, that business relationship itself becomes confidential and proprietary (Gundermann & Gundermann Ins. v Brasill, 46 AD3d 615 [2d Dept 2007]).
Defendant Hong argues the following:
Hong asserts that for Plaintiffs to succeed on the breach of Non-Disclosure Agreement claim, they must offer more than speculation. If Hong's denials that he revealed confidential information were uncontroverted, then the Court must dismiss Plaintiff's claim (Plymouth Mgt. & Advisors LLC v Lumiode, Inc., 2014 WL 2776619 [Sup Ct New York County 2014]; U.S. Re Cos., Inc. v Scheerer, 41 AD3d 152, 154-155 [1st Dept 2007]) (Defendant Hong's Conclusions of Law at ¶ 1).
In addition, where the proprietary and confidential information the employer is attempting to protect is readily ascertainable from sources outside its business, "trade secret protection will not attach" and the employee will not be enjoined by the restrictions of the non-disclosure agreement (Columbia Ribbon & Carbon Mfg. Co. v A-1-A Corp., 42 NY2d 496, 499 [1977]; citing, Leo Silfen, Inc. v Cream, 29 NY2d 387, 392 [1971]).
Hong states that: (1) Galvin was unable to identify him as one of the individuals who allegedly removed proprietary information from Stuart's office and no other witness testified that he did in fact remove or use any proprietary information; (2) Plaintiffs failed to identify which proprietary and confidential information or data Hong disclosed in violation of the Non-Disclosure Agreement; (3) Plaintiffs failed to provide any evidence or testimony that Hong, or any of the Defendants, unlawfully disclosed or used proprietary and confidential information regarding Stuart's LLC's private label designs (Defendant Hong's Conclusions of Law at ¶¶ 12-14).
With regard to the Aeropostale line, it is "impossible for Hong to have disclosed or used proprietary and confidential information and data," because Aeropostale "designs its own line and contracts with companies like Stuart's, LLC and Level 8 to produce and sell" them. Hong was not involved in the design of the Aeropostale designs "which are the sole property of Aeropostale and not Stuart's LLC" (Defendant Hong's Conclusions of Law at ¶ 15).
With regard to Tumi: (1) all designs had to be approved by Tumi which Krantzler confirmed in his testimony; (2) all designs created by Hong and approved by Tumi are the sole [*36]property of Tumi; (3) since any and all designs created by Hong had to be approved, and since all designs are the proprietary information of Tumi, then Hong could not have unlawfully disclosed Stuart's proprietary information with regard to the Tumi designs (Defendant Hong's Conclusions of Law at ¶ 16).
Defendant Hong notes that numerous former employees of Stuart's, including KK Park, Barone, Seo and Edelman had access and knowledge of Stuart's proprietary information and did not sign a non-disclosure agreement and were also alleged to have disclosed proprietary information (Defendant Hong's Conclusions of Law at ¶ 18).
Finally, Hong asserts that Plaintiffs have failed to include "any proof of actual damages caused by Hong's alleged breach and have failed to separate their breach of contract claim against him from all other damages claimed in this action (Defendant Hong's Conclusions of Law at ¶ 19).
The Court's Determination
The court finds and concludes that Plaintiffs failed to establish that Hong breached the Non-Disclosure Agreement and the third cause of action is dismissed.
Fourth Cause of Action - Violation of Limited Liability Law Against Stuart Edelman
Plaintiffs assert that Edelman violated New York's Limited Liability Company Law ("LLC Law") § 402(d)(2), "by approving the transfer of the assets of Stuart's to Level 8 without a vote of the majority interest of Stuart's members because he was only a minority member of Stuart's and he effectuated this transfer of assets without Galvin's vote or approval" (Plaintiffs' Pre-Trial Memorandum of Law at p 10).
Edelman asserts that none of the assets, including but not limited to licensing agreements, samples, designs, fixtures, and furnishings of Stuart's were taken, removed from or transferred to another company (Edelman's Post-Trial Submission at p 2).
The Court's Determination
The court finds and concludes that Edelman "exchanged", "pledged", "transferred" or disposed of the Tumi and Aeropostale licenses, which were substantially all of the assets of Stuart's, in violation of LLC Law 402. Although voiding the "exchanges"/"transfers" at issue is impossible, where a statutory right and violation thereof has been established, as here, the injured LLC is entitled to damages in the amount of lost profits. Accordingly, Stuart's is awarded damages in the amount of $719,064, with interest from September 1, 2009.
Fifth Cause of Action - Declaratory Judgment Against Level 8 Apparel, LLC
Plaintiffs assert that: (1) there has been no change in the company except as to the corporate form and that Level 8 is the mere continuation of Stuart's (Hendler v Murray, P.C. v Lambert, 114 AD2d 1003 [2d Dept 1985]); Matter of AT & S Transportation, LLC v Odyssey [*37]Logistics & Tech. Corp., 22 AD3d 750 [2d Dept 2005]); (2) Level 8 was the ultimate transferee of Stuart's asset, (Laco X-Ray Sys., Inc. v Fingerhut, 88 AD2d 425 [2d Dept 1982]); (3) the transferee (Level 8) had knowledge of the diversion of assets from Stuart's to Level 8; and (4) the transaction was entered into fraudulently to escape Stuart's obligations.
Level 8 and World Cross are jointly and severally liable for all debts of Stuart's, including the notes to Galvin and his family in the amount of $366,690.29, and the debts that Galvin incurred to Stuart's factor, Hana Financial, in the amount of $546,762 for the reason that they hired all of Level 8's employees (except Galvin), and took its customers and contractual relations with Tumi, Aeropostale, and Barney's, leaving Stuart's unable to pay creditors. Plaintiffs further assert that, "in equity Level 8 and WCC are the successor corporations of Stuart's and are liable for its obligations" (Plaintiffs' Proposed Findings at p 32).
The Level 8 Defendants argue the following:
The Plaintiffs have the burden of proving that: (1) the successor corporation expressly or impliedly assumed the liabilities of its predecessor; (2) there was a consolidation or de facto merger of the two business entities; (3) the purchasing corporation was a mere continuation of the predecessor; or (4) the transaction was entered into fraudulently to escape such obligations (Schumacher v Richards Shear Co., Ins., 59 NY2d 239 [1983]) (Level 8 Defendants' Conclusions of Law at ¶ 298).
With regard to the de facto merger, the Level 8 Defendants state that a "de facto merger occurs when the acquiring corporation has not purchased another corporation merely for the purpose of holding it as a subsidiary, but rather has effectively merged with the acquired corporation" (MBIA Ins. Corp. v Countrywide Home Loans, Inc., 40 Misc 3d 643, 657 [Sup Ct New York County 2013]). They also assert that in order to succeed on a claim for de facto merger, "Plaintiffs must prove: (a) continuity of ownership; (b) cessation of ordinary business operations and the dissolution of the selling corporation as soon as possible after the transaction; (c) the buyer's assumption of the liabilities ordinarily necessary for the uninterrupted continuation of the seller's business; and (d) continuity of management, personnel, physical location, assets and general business operation" (In re New York City Asbestos Litigation, 15 AD3d 254 [1st Dept 2005]; see also MBIA Ins. Corp., 40 Misc 3d at 657, supra) (Level 8 Defendants' Conclusions of Law at ¶¶ 299 - 300).
Under New York law, continuity of ownership "describes a situation where the parties to a transaction become owners together of what formerly belonged to each" (MBIA Ins. Corp., 40 Misc 3d at 657, supra, citing Van Nocker v A.W. Chesterton Co., 15 AD2d 254, 256 [1st Dept 2005]) (Level 8 Defendants' Conclusions of Law at ¶ 301).
According to the Level 8 Defendants: (1) Plaintiffs ignore the involvement of World Cross while Stuart's was in operation and after it ceased operations, and World Cross became a vendor for Aeropostale after Stuart's ceased operating; (2) the membership structures between Level 8 and Stuart's were starkly different with Stuart's members as Galvin and Edelman and Level 8's owner as Kuk Ja Kim; (3) there is no proof in the record that Stuart's was formerly dissolved; (4) Stuart's office was in a different location from the offices of World Cross and later the Level 8 offices; (5) Stuart's and Level 8 used different factors; and, (6) the "evidence in the [*38]record belies Plaintiffs' allegation that the Defendants arranged for the employees of Stuart's to become the employees of Level 8" (Level 8 Defendants' Conclusions of Law at ¶¶ 302 - 307).
In regard to the "assumption of liabilities" of the predecessor, Level 8 Defendants state that "Level 8 did not immediately assume any of Stuart's' debts and liabilities, or at any time assume Stuart's' debt to Mr. Galvin and his family, Hana, or Mr. Lister/WSG. Level 8 never paid any employees or creditors of Stuart's, and it was WCC that used commissions it owed Stuart's to cover its bills. Further, it was only in or about December 2009 that Level 8 agreed to pay the past-due royalties as a condition to obtain the new license" (Level 8 Defendants' Conclusions of Law at ¶ 308).
The Level 8 Defendants argue that there is no evidence that Level 8 "caused Stuart's to cease operations by stripping it of its assets, customers, and employees," and Stuart's had become an "unfunded operating company" as a direct result of its own inability to procure further financing after Mr. Lister made his final disbursement in January 2009, and was not a viable, operational business entity thereafter (Level 8 Defendants' Conclusions of Law at ¶ 310).
The Lister Defendants argue the following:
When Peter Lister "teamed up" with Sam Kim, Stuart Edelman and Michael Hong in forming Level 8 it was to protect and save his investment under his written agreements with Stuart's. It's understood that a successor is a person or entity who takes over and continues the role or position of another. Level 8 tried to revive the failed and insolvent business of Stuart's. Level 8 expressly or impliedly assumed the obligations of Stuart's and Level 8 is a mere continuation of Stuart's (Lister Defendants' Closing Argument at p 4).
The basic premise of Plaintiffs' claim, that Stuart's was a viable operating business with valuable assets is false. The Tumi license was in default; the business relationship with Aeropostale was poor and in jeopardy; and Stuart's prospects were bleak and it owned personal property with little to no value. As a practical matter, Stuart's ceased to exist and Level 8 was formed to try to salvage the efforts and investments of its employees and creditors actively involved in trying to turn Stuart's around (Lister Defendants' Closing Argument at pp 4-5).
The Court's Determination
The court finds and concludes that the Plaintiffs failed to establish that World Cross or Level 8 are the successor corporations of Stuart's or that a de facto merger occurred. Accordingly, the court dismisses the fifth cause of action.
Sixth Cause of Action- Breach of Promissory Note Against Stuart and Mary-Lee Edelman
Plaintiffs assert that on June 4, 2007, Galvin entered into a contract in the form of a promissory note with Edelman and his wife, Mary-Lee Edelman and the Edelmans breached the contract by failing to repay the amount due on demand.
Defendant Edelman argues the following:
Full payment was made including interest prior to the trial date, therefore this action should be dismissed (Edelman's Post-Trial Submission at p 2).
The Court's Determination
To the extent that the cause of action was not settled or discontinued, it is dismissed.
Seventh Cause of Action - Breach of Differential Agreement Against Stuart Edelman
Plaintiffs assert that the differential agreement is an oral agreement that is enforceable because it could be performed within one year (General Obligations Law § 5-701) and because there is objective evidence establishing its terms and the parties' intent to be bound (Flores v Lower East Side Service Center, Inc., 4 NY3d 363 [2005]; Priceless Custom Homes, Inc. v O'Neill, 104 AD3d 664 [2d Dept 2013]; Miller v Schloss, 218 NY 400 [1916]).
Plaintiffs also assert that Galvin performed the agreement by not taking more salary and fringe benefits from Stuart's than Edelman and Edelman breached the agreement by receiving more in salary and fringe benefits without reimbursing them in the amount of $52,729, plus interest (Plaintiffs' Pre-Trial Memorandum of Law at pp 3 - 5).
Plaintiffs assert that Edelman is liable to Galvin in the amount of $52,729 (Plaintiffs' Proposed Findings at p 29).
Defendant Edelman argues the following:
Edelman states "[r]egarding a differential agreement between myself and the Plaintiff, I have and continue to deny this agreement exists. This is an attempt for the Plaintiff to renege on a salary and benefits agreement we had, and he approved, issuing all the payroll checks with his signature. The Plaintiff has never provided the court with a copy of signed agreement" (Edelman's Post-Trial Submission at p 2).
All members and employee's salaries were discussed and agreed upon by both members, including employees making a much higher salary then both members (Edelman's Post-Trial Submission at p 2).
The Court's Determination
The court finds and concludes that the Plaintiff (Galvin) established entitlement to damages for breach of the differential agreement in the amount of $52,729, with interest from September 1, 2009.
Eighth Cause of Action- Unjust Enrichment in Differential Agreement Against Stuart Edelman
Plaintiffs assert that Edelman was enriched by not paying Galvin $52,729, plus interest, pursuant to an understanding that their salary and fringe benefits would be equalized while they were members of Stuart's; that this enrichment was at Galvin's expense because he lost the [*39]benefit of that money, and it is against equity and good conscience to allow Edelman to retain this benefit to Galvin's detriment (Anesthesia Assoc. of Mount Kisco, LLP v Northern Westchester Hosp. Ctr., 59 AD3d 473, 481 [2d Dept 2009]; Old Republic National Tital Ins. Co. v Luft, 52 AD3d 491 [2d Dept 2008]). 
Plaintiffs state "given that an unjust enrichment claim is barred if there is a valid and enforceable contract, (Whitman Realty Group, Inc. v Galano, 41 AD3d 590, 591 [2d Dept 2007]), [we] pursue this claim in the event that the Differential Agreement is found not to be an enforceable contract" (Plaintiffs' Pre-Trial Memorandum of Law at pp 10 -11).
Defendant Edelman argues the following:
Edelman denies being unjustly enriched in the amount of $52,729, stating "[n]owhere has the Plaintiff shown the court, in evidence, testimony or in depositions that my salary was ever agreed to be the same as the plaintiffs" (Edelman's Post-Trial Submission at p 2).
The compensation was agreed upon by both parties, with Galvin signing all the payroll checks and never signing or preparing a differential agreement (Edelman's Post-Trial Submission at p 2).
Members and employees were paid salaries, bonuses and benefits at a rate agreed upon by both Galvin and Edelman, but due to there being no profit distributions for either member, Galvin has made this unjustified claim, which has no merit (Edelman's Post-Trial Submission at p 2).
The Court's Determination
As this cause of action has been pled in the alternative to the seventh cause of action, on which the court granted judgment in favor of the Plaintiff (Galvin), it is dismissed (see A. Montilli Plumbing & Heating Corp. v Valentino 90 AD3d 961 [2d Dept 2011]).
Ninth Cause of Action- Tortious Interference with Contract Against Level 8 Apparel, LLC, World Cross Culture, Inc., Sam Kim, Michael Hong, Worldwide Sourcing Group, LLC and Peter Lister
Plaintiffs assert that: (1) Stuart's had a contract with Edelman in the form of an Operating Agreement; (2) the Defendants knew about Stuart's Operating Agreement; (3) the Defendants intentionally induced Edelman to breach Stuart's Operating Agreement; (4) Edelman breached Stuart's Operating Agreement; (5) Edelman would not have breached Stuart's Operating Agreement if it had not been for the Defendants' conduct in inducing him to breach it; (6) Defendants were not justified in their behavior; and (7) Plaintiffs sustained damages as a result.
The elements of the tort of interference with a contract are: (1) the existence of a valid contract; (2) defendants' knowledge of the contract; (3) defendants' intentional procuring of the breach; (4) absence of justification for the defendants' behavior; (5) the party would not have breached the contract but for the defendants' actions; and (6) damages (White Plains Coat & Aprin Co., Inc. v Cintas Corp., 8NY3d 422 [2007]; Ferrandino & Son, Inc. v Wheaton Builders, [*40]Inc., LLC, 82 AD3d 1035 [2d Dept 2011]; Oddo Asset Management v Barclays Bank PLC, 19 NY3d [2012]; Miller v Theodore-Tassy, 92 AD3d 650 [2d Dept 2012]).
Plaintiffs state that they need not show malice or wrongful means on the claim for interference with contract (A.S. Rampell, Inc. v Hyster Co., 3 NY2d 369 [1957]), whereas a claim for interference with prospective contract or business relationship does require such a showing (NBT Bancorp Inc. v Fleet/Norstar Financial Group, Inc., 87 NY2d 614 [1996]).
The Defendants' claim that their actions were justified is without merit because: (1) none of them were responsible for protecting Stuart's interests as none of them were officers, directors, or members of Stuart's; (2) the Defendants induced the breach for the sole purpose of gaining profit for themselves or to cause harm to Stuart's and Galvin; and (3) the Defendants used wrongful means in that they conspired with Edelman: (a) to fraudulently misrepresent to Stuart's customers (including Aeropostale and others) and to Stuart's licensor (Tumi) that Edelman was the Managing Member of Stuart's with the ability to bind Stuart's to business deals (intentionally fallacious communications have been held to constitute "wrong means") (Freedman v Pearlman, 271 AD2d 301 [1st Dept 2000]); (b) to fraudulently misrepresent to Stuart's customers and licensee that Stuart's was merely changing its name to Level 8 to induce Stuart's customers and licensee to switch from doing business with Stuart's to doing business with Level 8; (c) to bind Stuart's to new business deals with Stuart's customers and licensee that resulted in those customers and licensee switching from doing business with Stuart's to doing business with Level 8; (d) to violate New York's Limited Liability Law by transferring the assets of Stuart's to Level 8 without a majority vote that would have had to include Galvin's vote and approval (Schorr v Guardian Life Ins. Co. of America, 44 AD3d 319 [1st Dept 2007]); and (e) to violate New York's Debtor & Creditor Law by fraudulently transferring the assets of Stuart's to Level 8 without fair consideration (Plaintiffs' Pre-Trial Memorandum of Law at pp 15 - 18).
Plaintiffs assert that Defendants are liable to Galvin and Stuart's in the amount of $840,061 together with interest, costs and disbursements (Plaintiffs' Proposed Findings at p 31).
Level 8 Defendants argue the following:
The Level 8 Defendants assert that "[p]laintiffs must prove that the Level 8 Defendants' knowledge was actual, rather than constructive, and the Level 8 Defendants must have had actual knowledge of the contract at the time the breach was induced (A.A. Tube Testing Co. v Sohne, 20 AD2d 639 [2d Dept 1964], [As an essential element of the cause of action sought to be pleaded, the plaintiff must allege that the defendants had actual knowledge, and allegation that they 'should have known' of the existence of the contract is insufficient]; see also, Roulette Records, Inc. v Princess Production Corp., 15 AD2d 335 [1st Dept 1962])" (Level 8 Defendants' Conclusions of Law at ¶¶ 213 -214). "[A] cause of action for tortious interference with contractual relations does not lie when the defendant acted negligently or the interference was merely incidental" (Alvord and Swift v Stewart M. Muller Const. Co., Inc., 46 NY2d 276 [1978]) (Level 8 Defendants' Conclusions of Law at ¶ 215).
The record is clear that neither Kim nor Missy Moon had any actual knowledge of Stuart's Operating Agreement, or Galvin's 81% membership interest in Stuart's, but to the extent that the Court finds there was interference with the Operating Agreement, there was "no [*41]intentional interference, and the Court must look to the actions, conduct and private communications of Lister, Edelman in November and December 2008 and January 2009, none of which included Mr. Kim and Ms. Moon" (Level 8 Defendants' Conclusions of Law at ¶¶ 216 -217).
Defendant Hong argues the following:
Hong states that the Plaintiff must establish that he had "actual" knowledge about the contract; and that it is not enough to merely establish that he "should have known" about the existence of the contract (A.A. Tube Testing Co. v Shone, 20 AD2d 639 [2d Dept 1964]). Plaintiff must also establish that Hong's conduct was intentional rather than negligent or incidental to some other purpose (Alvord and Swift v Stewart M. Muller Constr. Co., 46 NY2d 276 [1978]). "In a contract interference case . . . the plaintiff must show the existence of its valid contract with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach, and damages" (600 Mgt. LLC v Lencheski, 2010 WL 9950445 [Sup Ct New York County 2010] citing Burrows v Combs, 25 AD3d 370, 373 [1st Dept 2006]) (Defendant Hong's Conclusions of Law at ¶¶ 22- 23).
Galvin was unable to testify that he had any document, or witnessed any conversation, or is aware of any admission by anyone showing that Hong had any involvement in Edelman's decision to separate from Stuart's. In fact, all witnesses who testified at trial specifically stated that Hong had no involvement and did not play a part in Edelman's decision to separate from Stuart's (Defendant Hong's Conclusions of Law at ¶ 27).
The Court's Determination
The court finds and concludes that the Plaintiffs failed to establish that the Defendants induced Edelman to breach the Operating Agreement and the claim is dismissed.
Tenth Cause of Action- Tortious Interference with Contract with Tumi Against Level 8 Apparel, LLC, World Cross Culture, Inc., Sam Kim, Michael Hong, Worldwide Sourcing Group, LLC and Peter Lister
Plaintiffs assert that: (1) Stuart's had a Licensing Agreement with Tumi pursuant to which Stuart's was granted the right to manufacture clothing using the Tumi brand name and which required Stuart's to pay a royalty fee to Tumi for this right; (2) Defendants knew about Stuart's Licensing Agreement with Tumi; (3) the Defendants induced Edelman to cause Stuart's to breach the Tumi Licensing Agreement by aiding Edelman in transferring the Tumi Licensing Agreement from Stuart's to Level 8; (4) at the request of Defendants, Stuart's breached the Tumi Licensing Agreement by failing to make royalty payments due to Tumi pursuant to that agreement and intentionally refraining from seeking an extension of time or waiver of royalty payments so that Tumi would default Stuart's and transfer the Licensing Agreement to Level 8; (5) there was no justification for the Defendants' behavior; (6) Stuart's would not have breached the Tumi Licensing Agreement if it had not been for the Defendants' conduct; and (7) Stuart's and Galvin [*42]sustained damages as a result of the breach of the Tumi Licensing Agreement (Plaintiffs' Pre Trial Memorandum of Law at pp 18 - 19). In their proposed findings and conclusions, the Plaintiffs alter the claim somewhat by adding that the Defendants conspired to cause Tumi to enforce the breach by Stuart's.
Plaintiffs assert that Defendants are liable to Stuart's in the amount of $3,045,643 together with interest, costs and disbursements (Plaintiffs' Proposed Findings at p 31).
Level 8 Defendants argue the following:
The Plaintiffs must prove that Tumi breached the License Agreement (Oddo Asset Mgmt., 19 NY3d 584 [2012]) and that "but for" the Defendants' intentional conduct, Tumi would not have breached the License Agreement (see Ferrandino & Son, Inc., 82 AD3d 1035 [2d Dept 2011]) (Level 8 Defendants' Conclusions of Law at ¶ 255).
The Level 8 Defendants also state that Galvin cannot maintain a cause of action for tortious interference with the Tumi License Agreement, "as he was not a party to the contract, and has no residual rights under the License Agreement giving him standing to pursue such a claim individually or as a member of Stuart's" (see Routis v Swanson, 26 AD2d 67 [1st Dept 1966]) (Level 8 Defendants' Conclusions of Law at ¶ 256).
Whether Stuart's could have performed under the contract with Tumi absent the alleged interference by Defendants is a significant factor for the court to consider; here, Plaintiffs defaulted in their contractual obligations to Tumi, and Defendants' actions did not cause the breach (see Tayeh v Intercoastal Capital Corp., 176 AD2d 719, 720 [2d Dept 1991]; see also D'Ambrosio v Racanelli, 101 AD3d 1069, 1071 [2d Dept 2012] [holding that the plaintiff's actions were relevant to the claim for tortious interference, as they could serve as evidence that the third party decided to terminate the relationship prior to the defendant's alleged interference]) (Level 8 Defendants' Conclusions of Law at ¶¶ 259 - 260).
Plaintiffs gave no evidence at trial that "but for" any of the actions taken by any of the Defendants, Tumi would have continued under the License Agreement with Stuart's and that Stuart's would have been able to perform under the terms of the agreement with Tumi. As of February 2009, Stuart's "could no longer function as a viable business"; as Galvin said, Stuart's was an "unfunded operating company" with no money to pay creditors or payroll. Stuart's was also in breach of the obligation to have a designated designer and could not meet the rent obligations for the required showroom (Level 8 Defendants' Conclusions of Law at ¶¶ 261 - 264).
Defendant Hong argues the following:
In order to meet the prima facie elements of its tortious interference claim, Plaintiffs were required to show "the existence of its valid contract with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach, and damages" and allege "that the contract would not have been breached 'but for' the defendant's conduct" (600 Mgt. LLC v Lencheski, 2010 WL 9950445 [Sup Ct New York County 2010] citing Burrowes v Combs, 25 AD3d 370, 373 [1st Dept 2006]) (Defendant Hong's Conclusions of Law at ¶ 29).
Hong cites to Krantzlers testimony, stating that he (1) did not remember a meeting with [*43]Edelman and Hong on March 16, 2009 at 4:00 p.m. at which the transfer of the license from Stuart's to Level 8 was discussed; (2) did not remember a meeting with Edelman or others from Level 8, including Hong, asking Tumi to put Stuart's into default; (3) did not have a recollection of anyone directing Tumi to stop paying Stuart's and write checks to Level 8 or Level 8's factor; (4) did not remember there being a relationship between Stuart's default and issuance of a new license to Level 8; (5) and did not remember any discussions about putting Stuart's into default so that Tumi could issue a license to Level 8. Also, Hong did not ask Krantzler to put Stuart's in default and, in 2009, all communications between Krantzler and Hong concerned product and/or design and nothing else (Defendant Hong's Conclusions of Law at ¶ 32).
Hong asserts that "Galvin was unable to testify that he had any document or witnessed any conversation or is aware of any admission by anyone showing that Hong had any involvement in Tumi's decision to put Stuart's, LLC into default and to sever it relationship with Stuart's" (Defendant Hong's Conclusions of Law at ¶ 34).
The Court's Determination
The court notes that the Plaintiffs and Level 8 Defendants articulate the cause of action for tortious interference in different ways, the former asserting that all Defendants prevented Stuart's from performing and caused it to breach the agreement in order to obtain the Tumi license for Level 8 (Restatement 2d Torts, § 766A; Sustainable PTE Ltd. v Peak Venture Partners LLC, 2015 WL 8490457 [Supreme Court New York County 2015]) modified other grounds 150 AD3d 554 [1st Dept 2017]), and the latter re-stating the claim to require proof that Defendants caused Tumi to breach the agreement with Stuart's.
"'Tortious interference' [of contract] can take many forms" (see generally, Prosser, Torts § 129 [4th ed]). * * * [T]he degree of protection available to a plaintiff for a competitor's tortious interference with contract is defined by the nature of the plaintiff's enforceable legal rights. Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior * * * * Where there has been no breach of an existing contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant) (see NBT Bancorp v. Fleet/Norstar Fin. Group, 87 NY2d 614, 621 [1996]) [internal citations omitted]).
Although it is true that Stuart's had failed to pay royalties to Tumi as required, evidence was presented that its agreed to refrain from demanding payment and from "defaulting" Stuart's based on failure to pay royalties; it was only after communications with the Defendants in which Tumi was presented with the Defendants' plan to transfer the license to Level 8 and enforce the contract royalty requirements that the default was ordered. In this regard, Tumi advised that the license could not be transferred but had to be reissued, thus necessitating the default. The court finds that this action by Tumi would not have occurred but for the wrongful actions of the Defendants. That Hong, Kim and Moon were not present at the relevant meeting with Tumi at which the default was discussed and also denied knowledge of the actions of the other Defendants is not relevant. Their testimony in this regard is not credible; their positions with Level 8 and involvement in its formation, and the other testimony and evidence presented, clearly [*44]demonstrate a conspiracy between all the defendants and a causal connection between the Defendants' conduct and the default. 
Accordingly, the court finds and concludes that the Defendants tortiously interfered with Stuart's contract relating to Tumi. As a result, Stuart's is entitled to receive damages against the Defendants in the amount of $173,375, with interest from September 1, 2009. The court notes that it awards damages for only the year 2009, as it is speculative to conclude that Stuart's would have survived beyond that time. The court cannot conclude that the 2009 sales would have caused Stuart's to "turn the corner" on its financial difficulties. Damages are awarded to Stuart's and not to Galvin personally.
Eleventh Cause of Action- Tortious Interference With Advantageous Business Relations with Tumi Against Level 8 Apparel, LLC, World Cross Culture, Inc., Sam Kim, Michael Hong, Worldwide Sourcing Group, LLC and Peter Lister
Plaintiffs assert the following: (1) that they had an advantageous business relationship with Tumi because Stuart's had a license to produce clothing bearing the Tumi label, from which Stuart's had the opportunity to derive substantial income; and with Aeropostale because it had been Stuart's biggest customer; (2) the Defendants knew about these prospective economic advantages to Stuart's; (3) the Defendants intentionally interfered with Plaintiffs' prospective economic advantages by using wrongful means to divert them to themselves including: (a) conspiring with Edelman to fraudulently misrepresent to Tumi and Aeropostale that Edelman was the Managing Member of Stuart's with the ability to bind Stuart's to business deals; (b) conspiring with Edelman to fraudulently misrepresent to Tumi and Aeropostale that Stuart's was merely changing its name to level 8 to induce Tumi to default Stuart's and to induce Tumi and Aeropostale to transfer their business from Stuart's to Level 8; (c) conspiring with Edelman to violate New York's Limited Liability Law by transferring the assets of Stuart's (including the Tumi license and Aeropostale business) to Level 8 without a majority vote that would have had to include Galvin's vote and approval; and (d) conspiring with Edelman to violate New York's Debtor & Creditor Law by fraudulently transferring the assets of Stuart's (including the Tumi license and Aeropostale's business) to Level 8 without fair consideration. The wrongful conduct was, therefore, directed at Tumi and Aeropostale in that the Defendants' misrepresentations were made to them; (4) had it not been for the Defendants' interference, Tumi and Aeropostale would not have defaulted Stuart's or transferred their business from Stuart's to Level 8; and (5) Plaintiffs sustained damages as a result of the Defendants' actions.
Plaintiffs state that the elements of a claim for tortuous interference with prospective economic advantage include: (1) the opportunity to have a business relationship; (2) the defendants knew about that opportunity even though the specifics of that opportunity need not be known (Caprer v Nussbaum, 36 AD3d 176 [2d Dept 2006]); (3) the defendants intentionally interfered with that opportunity (Kirk v Schindler Elevator Corp., 49 AD3d 300 [1st Dept 2008); (4) the defendants used wrongful means or acted for the sole purpose of harming the plaintiffs; (5) but for the defendants' conduct, the plaintiffs would have entered into that business relationship (A.S. Rampell, Inc. v Hyster Co., 3 NY2d 369 [1957]; M.J. & K Co., Inc. v Matthew Bender and Co., Inc., 220 AD2d 488 [2d Dept 1995]; and (6) damages (see generally Carvel [*45]Corp. v Noonan,3 NY3d 182 [2004]).
"[W]rongful means" includes: (1) the breach of fiduciary duty (Out of Box Promotions, LLC v Koschitzki, 55 AD3d 575 [2d Dept 2008]); (2) violation of a code (Schorr v Guardian Life Ins. Co. Of America, 44 AD3d 319 [1st Dept 2007]); and (3) an intentionally fallacious communication to the business prospect (Freedman v Pearlman, 271 AD2d 301 [1st Dept 2000]). The measure of damages includes lost profits (Duane Jones Co. V Burke, 306 NY 172 [1954]), and punitive damages where the interference involves a breach of fiduciary duty (Don Buchwald & Associates, Inc. v Rich, 281 AD2d 329 [1st Dept 2001]).
Plaintiffs state that allegations of conspiracy are permitted when they serve to connect a defendant to an otherwise actionable tort (North Shore Bottling Co. v C. Schmidt & Sons, Inc., 22 NY2d 171 [1968]). Concerted action liability rests upon the principle that all those whom in pursuance of a common plan or design to commit a tortuous act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him (Plaintiffs' Pre-Trial Memorandum of Law at pp 20 - 22).
Plaintiffs assert that Defendants are liable to Stuart's in the amount of $5,845,061 together with interest, cost and disbursements (Plaintiffs' Proposed Findings at p 32).
Level 8 Defendants argue the following:
Level 8 Defendants assert that Plaintiffs have not proven "wrongful means". They state that tortious interference with business relations "applies to those situations where the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant" (M.J.K. Co.,, Inc. v Matthew Bender and CO., Inc., 220 AD2d 488 [2d Dept 1995] quoting WFB Telecommunications v NYNEX Corp., 188 AD2d 257 [1st Dept 1992]). Also, "where no binding contract is interfered with, and there is no unlawful restraint of trade, the Restatement provides that the competitor will not be liable so long as the means employed are not wrongful" (Carvel Corp. v Noonan, 3 NY3d 182 [2004]). They further state that "while economic pressure brought to bear by one contracting party on the other may, in rare occasions be tortious, it cannot constitute the tort of interference with economic relations." Moreover, there is no tortious interference where the defendant's "motive in interfering . . . was normal economic self-interest," and the defendant was "indifferent to the [plaintiffs] fate" (Id. at 190) (Level 8 Defendants' Conclusions of Law at ¶¶ 268 -271).
According to the Level 8 Defendants, there is no evidence that they acted with "wrongful means" regarding the Tumi License; Mr. Kim was not present at any of the March meetings with Tumi and did not request that Tumi terminate or otherwise assign its License Agreement with Stuart's. Rather, the evidence indicates that no "wrongful means" were undertaken by anyone and that any action with regard to the Tumi brand and license had been at Mr. Krantzler's sole direction (Level 8 Defendants' Conclusions of Law at ¶¶ 273 -275).
The Level 8 Defendants assert that this cause of action is "redundant" with the tenth cause of action, "in that Plaintiffs allege to have had a contract with Tumi, and therefore, they cannot also maintain a cause of action for tortious interference with advantageous business relations." Also, they argue that the Tumi license was not transferable, and "could not have been, [*46]nor was it, assigned to Level 8" (Level 8 Defendants' Pre-Trial Memorandum of Law at p 9).
Defendant Hong argues the following:
To state a claim for tortious interference with advantageous business relations, plaintiffs must allege that: "(1) a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship" (Men Women NY Model Mgt .Inc. v Ford Models, Inc., 32 Misc 3d 1236A [Sup Ct New York County 2011] citing Kirsch v Liberty Media Corp., 449 F.3d 388, 400 [2d Cir 2006]) (Defendant Hong's Conclusions of Law at ¶ 36).
Additionally, as a general rule, where a defendant is alleged to have interfered with "prospective contracts or other non-binding economic relations," rather than with existing contract rights, a plaintiff must show, "[that] defendant's conduct . . . amount[s] to a crime or an independent tort" or that defendant engaged in its conduct "for the sole purpose of inflicting intentional harm on Plaintiffs" (Men Women NY Model Mgt., Inc., 32 Misc 3d at 1236[A], supra; citing MMC Energy, Inc. v Miller, 2009 WL 2981914 at *7 [SDNY 2009]; Carvel Corp. v Noonan, 3 NY3d 182, 190 [2004]) (Defendant Hong's Conclusions of Law at ¶ 37).
Conclusory allegations or statements by the Plaintiffs, for example, that the Defendants intentionally, maliciously or improperly interfered with the advantageous business relations are patently insufficient. Here, all of Plaintiffs' allegations of tortious conduct against Defendant Hong are purely conclusory, and there is no evidence of malicious conduct (Defendant Hong's Conclusions of Law at ¶ 39).
In comparison to an interference with a contractual relationship cause of action, there is no binding contract under a cause of action of interference with advantageous business relations. "Where no binding contract is interfered with, and there is no 'unlawful restraint of trade,' the Restatement [Second] of Torts] provides that the competitor will not be liable so long as 'the means employed are not wrongful'" (Carvel Corp. v Noonan, 3 NY3d at 191 supra; citing Guard-Life Corp. v S. Parker Hardware Mfg. Corp., 50 NY2d 183 [1980]) (Defendant Hong's Conclusions of Law at ¶ 40).
Besides Galvin's self-serving statements, which are not corroborated by any other witness or any document, there is no basis to find Hong liable for tortiously interfering with Stuart's business relations with Tumi. Relying on "surmise or speculation" is insufficient (Williams & Co. v Collins Tuttle & Co., 6 AD2d 302, 306 [1st Dept 1958]) (Defendant Hong's Conclusions of Law at ¶ 44).
Plaintiffs have failed to produce any evidence that Defendant Hong, who was an employee of Stuart's and subsequently an employee of Level 8, acted solely out of malice to specifically injure Plaintiffs. In fact, it is critical to note that Plaintiffs did not bother proving their claims against Defendant Hong or meeting their prima facie elements against Hong, but instead were contempt with grouping defendant Hong with all other defendants (Defendant Hong's Conclusions of Law at ¶ 45).
Plaintiffs have not alleged that "but for" Hong's conduct, the agreements would not have been terminated and they would have been able to maintain their contractual relationships with [*47]Tumi and Aeropostale(Defendant Hong's Conclusions of Law at ¶ 46).
Defendant Edelman argues the following:
The Plaintiffs have failed to prove that any of the Defendants made any request directly to Tumi to put Stuart's in default (Edelman's Post-Trial Submission at p 2).
Stuart's inability to pay its contractual fees and obligations under its License Agreement with Tumi put Stuart's in default with Tumi, and its inability to cure its default caused Tumi's letter of termination (Edelman's Post-Trial Submission at p 3).
The Court's Determination
In view of the court's determination on the tenth cause of action, the eleventh cause of action is dismissed. The court notes that it might otherwise have been possible, as an alternative basis for liability, to analyze the Plaintiffs' claim from the standpoint of tortious interference with "advantageous business relations." In this regard, considering that Stuart's was in breach of its multi-year contract with Tumi (by failing to make royalty payments) and that Tumi agreed to refrain from "defaulting" Stuart's, it could be argued that the Stuart's-Tumi contract should be treated as one that was terminable at-will. In such event, liability for interference with this relationship would be analyzed under principles applicable to tortious interference with prospective business relations (Guard-Life Corp. v S. Parker Hardware Mfg. Corp., 50 NY2d 183 [1980]; NY PJI 3:56, at p.565; NY PJI 3:57, at pp 590-91). Under the facts and circumstances presented herein and at trial, the court would then conclude that the Defendants were liable for tortious interference with the business relationship between Stuart's and Tumi, in view of Edelman's breach of fiduciary duty, the wrongful actions of the Defendants and their conspiracy to force the default in order to "transfer" the license to Level 8. 
Twelfth Cause of Action - Tortious Interference with Aeropostale Against Level 8 Apparel, LLC, World Cross Culture, Inc., Sam Kim, Michael Hong, Worldwide Sourcing Group, LLC and Peter Lister
Level 8 Defendants argue the following:
"To the extent that either Plaintiffs move to conform their pleading to the proof adduced at trial, or the Court does so sua sponte, the Level 8 Defendants respectfully submit that the Twelfth Cause of Action should be deemed to be tortious interference with Stuart's contractual relationship with Aeropostale, as the credible proof demonstrates the existence of a contractual relationship between Stuart's and Aeropostale" (Level 8 Defendants' Conclusions of Law at ¶ 277).
Level 8 Defendants make the same "wrongful means" argument that they made with respect to the eleventh cause of action (Level 8 Defendants' Conclusions of Law at ¶¶ 279 -280). They further assert that: (1) although Stuart's entered into a "Master Sourcing Agreement" with Aeropostale, it was not an exclusive arrangement (Aeropostale had more than one outerwear [*48]vendor at the same time as its relationship with Stuart's); (2) Kim was never aware of the Master Sourcing Agreement until 2015; (3) Galvin stated in an email, dated Feb 5, 2009, "Aeropostale will cease doing business with us when they find out we're bankrupt . . . ." (Level 8 Defendants' Conclusions of Law at ¶¶ 281- 283).
Level 8 asserts that, the change in vendor name from Stuart's to World Cross came about following the communications that Mr. Kim received from two individuals, "JP" and Joe Ingrassia, who worked at Capstone, WCC's factor for manufacturing Aeropostale. World Cross said to Aeropostale that it "would not be financially responsible for Stuart's" and "asked them [Aeropostale] to deal directly with WCC". At the time Kim received these communications from "JP" and Ingrassia, Kim was aware that Stuart's was "not doing well" financially, and was having trouble paying other bills from vendors, and he had heard on "Seventh Avenue" that Stuart's was "in a very dangerous situation." Notwithstanding, in April 2009, the vendor number with Aeropostale changed from Stuart's to World Cross; Aeropostale did not breach the Master Sourcing Agreement, as there was no exclusive, and no obligation to purchase goods from Stuart's (Level 8 Defendants' Conclusions of Law at ¶¶ 284 - 285).
Defendant Michael Hong argues the following:
[In addition to the arguments and points stated in the eleventh cause of action]
The record is clear that a few days before resigning from Stuart's, Hong was approached, had several interviews with, and was offered a job position with third-party G-III because of Stuart's financial troubles and because Galvin encouraged him to look for another job (Defendant Hong's Conclusions of Law at ¶¶ 52 & 54).
Defendant Edelman argues the following:
The Plaintiffs' claim is without merit as there is no evidence that the defendants conspired to put Stuart's out of business. Galvin's testimony and submitted evidence shows that at the direction of the manager and the directing member of Stuart's, Galvin ordered the wind down and liquidation of Stuart's (Edelman's Post-Trial Submission at p 3).
In fact, World Cross, with the consent of Stuart's, was selling, billing and shipping the merchandise directly to Aeropostale and Stuart's was acting as a sales agent, collecting a commission for doing so. The Aeropostale vendor agreement was between World Cross and Aeropostale since Stuart's could not fund the business with Aeropostale and Galvin agreed to have World Cross bill and ship directly to Aeropostale as the vendor of record (Edelman's Post-Trial Submission at p 1).
The Court's Determination
The court finds and concludes that the Defendants tortiously interfered with Stuart's contractual relations with Aeropostale. In this regard, the Defendants employed use of Stuart's vendor number for the benefit of a competing business and misrepresented to Aeropostale that Stuart's name and address was changing to Level 8 at a new address. Although not all the [*49]Defendants made misrepresentations to Aeropostale, the Defendants conspired to engage in wrongful conduct for their own benefit and their positions with and work for Level 8 (and World Cross) warrants a finding of liability against all of them. As a result, Stuart's is awarded damages in the amount of $543,689, with interest from September 1, 2009. 
Thirteenth Cause of Action- Unfair Competition Against Level 8 Apparel, LLC, World Cross Culture, Inc., Sam Kim, Michael Hong, Worldwide Sourcing Group, LLC and Peter Lister
Plaintiffs allege the following: (1) they owned trade secrets because, through the use of their own efforts, money, and skill, they developed unique and valuable clothing designs, models and sketches; they derived income from the uniqueness of those items; those things were not known outside of Stuart's; and they took measures to protect them by having employees like Hong sign Non-Disclosure Agreements; (2) the Defendants misappropriated those trade secrets by using them at Level 8 to compete with Stuart's by making identical clothing and profiting from their misappropriation; (3) they suffered damages as a result of the Defendants' unfair competition.
"[A] trade secret is any formula, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it" (Restatement of Torts § 757; Ashland Management, Inc. v Janien, 82 NY2d 395 [1993]; Eastern Business Systems, Inc. v Specialty Business Solutions, LLC (292 AD2d 336 [2d Dept 2002]).
Plaintiffs demonstrated that: they owned trade secrets; the defendants misappropriated those secrets for their commercial advantage; causation; and damages (ITC, Ltd. v Punchigini, Inc., 9 NY3d 467 [2007]). Also, "the principle that one may not misappropriate the results of the skill, expenditures and labors of a competitor is predicated on the concept that no one is entitled to reap where it has not sown" (International News Service v Associated Press 248 US 215 [1918]; Electrolux Corp. v Val-Worth, Inc. 6 NY2d 556 [1959]; Fisher v Star Co., 231 NY 414 [1921]; Out of Box Promotions, LLC v Koschitzki, 55 AD3d 575 [2d Dept 2008]).
Plaintiffs assert that Defendants are jointly and severally liable to Stuart's in the amount of $5,840,061 (Plaintiffs' Proposed Findings at p 31).
The Level 8 Defendants assert the following:
Plaintiffs bear the burden of demonstrating by a preponderance of the evidence, that the Level 8 Defendants "misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship" (Big Vision Private Ltd. v E.I. du Pont de Nemours and Co., 610 Fed. Appx. 69, 70 [2d Cir 2015] "[t]his includes the exploitation of proprietary information or trade secrets" (Eagle Comtronics, Inc. v Pico Products, Inc., 256 AD2d 1202, 1203 [4th Dept 1998]) (Level 8 Defendants' Conclusions of Law at ¶ 242).
Plaintiffs have not proven unfair competition in that Plaintiffs were not a viable business entity on or before February 2009, and therefore had no "commercial advantage"; in any event, Plaintiffs had no proprietary information or trade secrets. All of the designs, sketches, samples, [*50]and logos, as well as any other trademarked or proprietary information belonged to either Tumi or Aeropostale (Level 8 Defendants' Conclusions of Law at ¶¶ 244 -246).
Galvin testified that he believed Barrone, Park and Seo disclosed proprietary information, as they may have been privy to pricing and customer lists while they were at Stuart's, although none of them were asked to sign a non-disclosure agreement. Thus, Galvin failed to safeguard that information. The "failure to take any measures to guard the secrecy of information known by employees and others in the business is to be considered when determining whether the information could be fairly characterized as a 'trade secret' or 'proprietary information'" (see Ashland Mgmt. Inc. v Janien, 82 NY2d 395 [1993]; see also Schroeder v Pinterest Inc., 133 AD3d 12 [1st Dept 2015]). Plaintiffs have failed to present any evidence that the Level 8 Defendants "actually utilized any of [Plaintiffs'] confidential information at all" or any of the Plaintiffs "business information", which is fatal to their claim of unfair competition (Big Vision Private Ltd., 610 Fd. Appx at 71, supra) (Level 8 Defendants' Conclusions of Law at ¶¶ 249 - 250).
Defendant Hong argues the following:
The information that Plaintiffs claim was proprietary and/or secret to Stuart's is limited to "designs, models, sketches, reputation, and good will" as alleged in the thirteenth cause of action for unfair competition (Complaint at ¶ 119). However, Hong had no involvement or authority to take any action to jeopardize Plaintiffs' rights in that proprietary and/or secret information (Defendant Hong's Conclusions of Law at ¶ 63).
Furthermore, Krantzler, Tumi's Chief Merchandising Officer, testified that Hong did not have any involvement or discussion with Tumi regarding the transfer or any assets of rights of Stuart's to Level 8 and that Hong's sole involvement was pertaining to product and/or design. Also, Geiger, who was CEO, President or Chairman of Aeropostale during all relevant times herein, did not testify that Hong had any involvement in Aeropostale's decision to sever its relationship with Stuart's or enter into a vendor agreement with Level 8. Even Galvin testified that defendant Hong did not pressure him to step aside from Stuart's (Defendant Hong's Conclusions of Law at ¶ 64).
Galvin did not know whether Hong removed any items from Stuart's office and transferred them to Level 8's office and is basing his claims against Hong purely on speculation. In addition, no other witness testified that they witnessed Hong removing any proprietary information from Stuart's and Hong adamantly denied doing so (Defendant Hong's Conclusions of Law at ¶ 65).
The Court's Determination
The court finds that the Defendants engaged in unfair competition with Stuart's. As a result, Stuart's is awarded damages in the amount of $719,064, with interest from September 1, 2009. The court finds and concludes that the Defendants conspired to wrongfully compete with Stuart's by hastening its demise and attempting to transfer it's work product and customers to Level 8.
[*51]Fourteenth Cause of Action - Conversion Against Level 8 Apparel, LLC, World Cross Culture, Inc., Sam Kim, Michael Hong, Worldwide Sourcing Group, LLC and Peter Lister
Plaintiffs allege that they owned certain property, including Stuart's computers, hard files, computer files, furniture, and clothing designs; that Defendants took control of those items by stealing them from Stuart's office and interfered with their right to use that property; and that Plaintiff's sustained damages as a result of Defendants' conversion.
Plaintiffs assert that Stuart's losses caused by the conversion of its good will and intellectual property to Level 8 and World Cross in the amount of $5,840,061 together with interest, costs and disbursements. (Plaintiffs note that the claim referenced in the complaint for computers, storage furniture, etc was withdrawn and dismissed). Plaintiffs further assert that Defendants are jointly and severally liable to Stuart's for punitive damages in the amount of $18,000,000 (treble damages) for their "willful and deliberate conversion of Stuart's property" (Plaintiffs' Proposed Findings at p 31).
The Level 8 Defendants assert the following:
The Level 8 Defendants assert that "with respect to the claim that Tumi clothing designs were converted, under the clear and express terms of the Tumi License Agreement, all of those designs, as well as the sketches and samples and the already-approved Fall 2009 line, were the exclusive property of Tumi. Thus, Plaintiffs cannot prove a possessory right, and therefore, cannot demonstrate that the Level 8 Defendants interfered with their so-called right to these designs" (Level 8 Defendants' Conclusions of Law at ¶ 236).
There is no testimony or documentary evidence indicating that Kim or Missy Moon actually took any designs, samples or tech packs and Galvin admitted he never saw the Level 8 Defendants remove the samples or designs (Level 8 Defendants' Conclusions of Law at ¶ 237). Neither is there proof of any value of any of the items that were allegedly converted, including proof of value of computers or files or of the designs (Level 8 Defendants' Conclusions of Law at ¶ 240).
Defendant Hong argues the following:
"A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession" (Colavito v New York Organ Donor Network, Inc., 8 NY3d 43, 49-50 [2006]; citing, State of New York v Seventh Regiment Fund, 98 NY2d 249 [2002]) (Defendant Hong's Conclusions of Law at ¶ 73). Conversion, which is concerned with possession and not with title, has two key elements: "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights" (Colavito v New York Organ Donor Network, Inc., 8 NY3d at 43, supra; citing, Pierpoint v Hoyt, 260 NY 26, 29 [1932]; Employers' Fire Ins. Co. v Cotten, 245 NY 102 [1927]; Restatement [Second] of Torts §§ 8A, 223, 243) (Defendant Hong's Conclusions of Law at ¶ 74).
The testimony of Krantzler, Geiger, Galvin and Hong, establishes that: (1) Hong did not [*52]communicate with either Tumi or Aeropostale to have them sever their agreements and relationships with Stuart's to benefit Level 8; (2) Hong could not have used the designs and samples from Tumi and Aeropostale because Tumi had control over its designs and lines and it had to approve each design before production and sale, and Aeropostale designed its own products; (3) Plaintiffs did not produce a single piece of evidence showing that Hong used Stuart's, private label designs during the time he worked at Level 8; (4) there is no evidence that Hong removed any of Stuart's, assets and transferred them to Level 8; and (5) Hong denies taking any of Stuart's assets, and the only items that he removed from Stuart's office were his radio and bobble-head figure (Defendant Hong's Conclusions of Law at ¶ 75).
Since Plaintiffs cannot show that Hong exercised dominion over or interfered with Plaintiffs' possessory right or interest in any of their assets, then the fourteenth cause of action against Hong for conversion must be dismissed (Defendant Hong's Conclusions of Law at ¶ 77).
Defendant Edelman argues the following:
The testimony at trial and all the evidence presented shows that none of the Defendants took control of the assets and property of Stuart's, which was left at the office of Stuart's at their 36th street location (Edelman's Post-Trial Submission at p 3).
The Court's Determination
The court finds and concludes that this cause of action should be dismissed as there was no proof as to the value of items allegedly converted and the designs were not owned by Stuart's.
Fifteenth Cause of Action- Declaratory Judgment - To Set Aside Transfer of Stuart's Assets
Plaintiffs assert that: (1) there was a conveyance of Stuart's assets to Level 8 by the Defendants; (2) the conveyance was made without fair consideration (There is a presumption of fraud when a conveyance is made by a debtor without consideration) (Gafco, Inc.v H.D.S. Mercantile Corp., 47 Misc 2d 661 [Civil Court City of New York 1965]; Monticello Mut. Bldg. & Loan Ass'n v Rapp, 235 AD 304 [1st Dept 1932]); and (3) Stuart's was or was rendered insolvent as a result of the conveyance.
Relief to which a defrauded creditor (Galvin) is entitled is generally limited to setting aside the conveyance; however, a money judgment against the transferee (Level 8) is an available form of substitute relief where the transferred assets have been sold or commingled with those of the transferee (Kantor v Mesibov, 8 Misc 3d 722, 728 [Sup Ct Nassau County 2005], citing Manufacturers & Traders Trust Co. v Lauer's Furniture Acquisition, 226 AD2d 1056, 1057 [4th Dept. 1996]) (Plaintiffs' Pre-Trial Memorandum of Law at pp 23 - 25).
Plaintiffs assert that Level 8 and World Cross are liable to Stuart's and Galvin for damages in the amount of Stuart's debt to Galvin, $366,690, and the amount that Galvin is obligated to pay to Hana, $546,762, together with interest, costs and disbursements (Plaintiffs' Proposed Findings at p 32).
Level 8 Defendants assert the following:
A cause of action for fraudulent conveyance under Section 273 of the Debtor and Creditor Law requires that the debtor must have been solvent prior to the alleged transfer, and that as a result of the transfer, the debtor has been rendered insolvent (Prudential Sav. Bank v Grant, 99 NYS2d 602, 603 [Sup Ct New York County 1950]; citing Stokes Coal Co. v Garguilo, 225 AD, 281 [1st Dept 1938], affd, 280 NY 616 [1939]) (Level 8 Defendants' Conclusions of Law at ¶ 290).
The Level 8 Defendants assert the following:
Plaintiffs have not proven that any property or assets have been conveyed to the Level 8 Defendants. Specifically, . . . the Tumi License Agreement was terminated by Tumi in its exclusive discretion, and a separate license agreement was subsequently entered into with Level 8. Moreover, the Tumi license was itself non-assignable. With regard to the Tumi designs, samples, tech packs, etc., they were not transferred from Stuart's to Level 8, and in any event, they were not the property of Stuart's, but rather, they indisputably belonged to Tumi.
Likewise, none of the designs, samples, or tech packs, of Aeropostale were transferred to Level 8, and again, they are the property of Aeropostale. The non-exclusive Master Sourcing Agreement that Stuart's had with Aeropostale was never transferred to WCC. Rather, Aeropostale entered into another non-exclusive agreement with WCC, and although it was apparently under the same vendor number issued by Aeropostale, there was no proof offered that such vendor number in a non-exclusive relationship is an asset that can be valued or that it otherwise was ascribed a value by Plaintiffs or their damages' expert (Level 8 Defendants' Conclusions of Law at ¶¶ 291- 292).
[T]hroughout much, if not all, of its existence, Stuart's was either insolvent * * * or, at best, had questionable financial wherewithal. For example, it could not meet its obligations of rent, payroll, and other operating expenses in November 2007, thereby requiring it to borrow $50,000 from Mr. Lister, well before Mr. Lister and WSG became the lending institution for Stuart's" (Level 8 Defendants' Conclusions of Law at ¶ 294).
Defendant Edelman argues the following:
There was no fraudulent transfer of any assets and property of Stuart's to Level 8 (Edelman's Post-Trial Submission at p 3).
The Court's Determination
The court finds and concludes that Plaintiffs failed to establish this cause of action and it is dismissed.
Sixteenth Cause of Action - Tortious Interference with Michael Hong's Contractual [*53]Relationship Against Level 8 Apparel, LLC, World Cross Culture, Inc., Sam Kim, Worldwide Sourcing Group, LLC and Peter Lister
Plaintiffs assert the following: (1) Hong had a Non-Disclosure Agreement with Stuart's; (2) Defendants knew about Hong's Non-Disclosure Agreement with Stuart's; (3) the Defendants intentionally induced Hong to breach the Non-Disclosure Agreement by planning and conspiring with Hong to disclose to them the propriety information that he obtained or developed during the course of his employment with Stuart's; and by engaging in unfair competition with Stuart's through the use of Stuart's proprietary information that Hong divulged to and shared with them; (4) Hong did, in fact, breach the Non-Disclosure Agreement by disclosing to the Defendants the proprietary information that he obtained or developed during the course of his employment with Stuart's; and by engaging in unfair competition with Stuart's through the use of Stuart's proprietary information that Hong divulged to and shared with them; (5) Defendants' behavior was not justified; (6) Hong would not have breached the Non-Disclosure Agreement if it had not been for the Defendants' conduct; and (7) Plaintiffs sustained damages as a result of the breach (Plaintiffs' Pre-Trial Memorandum of Law at p 19).
Plaintiffs assert that Defendants are liable to Stuart's for fraudulently interfering with Hong's Non-Disclosure Agreement in the amount of $175,375 (Plaintiff's Proposed Findings at p 29).
The Level 8 Defendants argue the following:
Neither Kim nor Missy Moon had actual knowledge of the Hong Non-Disclosure Agreement prior to the litigation and Plaintiffs must prove that they had actual knowledge of the contract (A.A. Tube Testing Co. v Sohne, 20 AD2d 639 [2d Dept 1964]) (Level 8 Defendants' Conclusions of Law at ¶¶ 224 and 229). Additionally, the Plaintiffs cannot establish the elements of this tortious interference claim, and, especially, the element of causation (Level 8 Defendants' Conclusions of Law at ¶ 226).
The Court's Determination
The court finds and concludes that Plaintiffs failed to establish this cause of action. While Hong conspired with the other Defendants to commit wrongful conduct against Stuart's, the Plaintiffs nevertheless failed to establish that but for the other Defendants' misconduct, Hong would not have breached the agreement. The court notes that it dismissed the cause of action based on Hong's alleged breach of the non-disclosure agreement (see discussion supra).
CROSS CLAIMS AND COUNTER CLAIMS
First Counterclaim Asserted by Stuart and Mary-Lee Edelman for Breach of Operating Agreement Against Wayne Galvin
Second Counterclaim Asserted by Stuart and Mary-Lee Edelman for Breach of Fiduciary Duty Against Wayne Galvin
First Counterclaim Asserted by Worldwide Sourcing and Peter Lister Against Stuart's LLC and Wayne Galvin and First Crossclaim Against Stuart Edelman for Breach of Contract
Second Counterclaim Asserted by Worldwide Sourcing and Peter Lister Against Stuart's LLC and Wayne Galvin and Second Crossclaim Against Stuart Edelman for Fraud in the Inducement
Third Counterclaim Asserted by Worldwide Sourcing and Peter Lister Against Stuart's LLC upon a Promissory Note 
Fourth Counterclaim Asserted by Worldwide Sourcing and Peter Lister Against Stuart's LLC and Wayne Galvin and Third Crossclaim Against Stuart Edelman for Unsecured Loans
The Court's Determination
The counterclaims advanced by the Edelman Defendants are without any merit and are dismissed. In this regard, no actionable wrong or damages were established.
The Lister Defendants' first counterclaim against Stuart's and Galvin for breach of contract is dismissed. It was not demonstrated by the Defendants that Stuart's breached the relevant contracts, that Galvin was personally obligated under any contract with the Defendants, or that Lister had any enforceable rights under said contracts. For the same reasons, the crossclaim is dismissed insofar as asserted against Edelman.
The Lister Defendants' second counterclaim and crossclaim are dismissed as no evidence was presented in regard to fraud practiced against Lister by Stuart's, Galvin or Edelman.
The Lister Defendants' third counterclaim for breach of the promissory note is dismissed as no evidence was presented to the effect that demand on the relevant note was made. This is also consistent with Lister's initial and actual goal of supporting Stuart's financially with a view towards becoming a member thereof. Moreover, there can be no personal liability on the note by Galvin or Stuart who executed the note in a representative capacity.
The Lister Defendants' fourth counterclaim and third crossclaim are dismissed as WSG and Lister failed to establish with evidence to the court's satisfaction (a preponderance of evidence) that the monies provided for payroll as described therein were loans rather than an investment in Stuart's. In this regard, it is without question that Lister invested significant sums in Stuart's—some monies were provided in the form of a loan and others were not; the sums sought to be recovered in this counterclaim were not a loan but were part of an investment in Stuart's. 
First Crossclaim Asserted by Worldwide Sourcing and Peter Lister Against Sam Kim and Level 8 for Breach of Verbal Agreement
The Lister Defendants allege:
"In or about February, 2009 Lister entered into a verbal arrangement with the Defendant [*54][Kim] who at that time was acting individually and on behalf of and with the authority of the defendant Level 8 Apparel LLC." The agreement "was that in exchange for funding one half of the operations of Level 8 during a limited * * * period, Kim and Level 8 would distribute to Lister 31 percent of Level 8's net profits." Lister performed all conditions on his part and Kim did not. Accordingly, the Level 8 Defendants are liable to the Lister in an amount of 31% of the net profits of Level 8 from February, 2009 plus interest at the statutory rate (Lister Defendants' Answer to the Second Supplemental Amended Complaint at ¶¶ 192- 197). 
The Level 8 Defendants' arguments that the agreement was uncertain and barred by the Statute of Frauds are without merit. The terms of the oral agreement were known and it was not shown that there was "absolutely no possibility in fact and law" that the agreement could have been performed within a year's time (Lister Defendants Closing Argument at p 21). The relationship between the parties was terminable, at-will and the measure of profit participation becomes fixed and earned during the same period. As such, the obligation to calculate such compensation (profits participation) does not bring the contract within the one-year proscription of the Statute of Frauds (Lister Defendants' Closing Argument at p 21).
Regarding the assertion that Level 8 and Mr. Kim earned no profits during the relevant time period and instead incurred significant losses, the evidence at trial demonstrated that the Level 8 Defendants deliberately manipulated the company's financial condition including charging as expenses doubtful items deliberately designed to make the company look unprofitable. Kim falsely asserts there were no profits due the rightful partners or owners of Level 8. However, the credible evidence shows commissions during the relevant period of $10,131,713.02 (Lister Defendants' Closing Argument at pp 22 -23).
The Level 8 Defendants argue the following:
The Level 8 Defendants state that in order to give rise to a binding and enforceable contract, there must be "an objective meeting of the minds," and "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (Matter of Express Indus. & Term. Corp. v New York State Dept of Transp., 93 NY2d 584, 589 [1999]). A court cannot enforce a contract unless it is able to determine what the parties actually agreed to (166 Mamaroneck Ave. Corp. v 151 East Post Road Corp., 78 NY2d 88, 571 [1991]). That is, if an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract (Cobble Hill Nursing Home, Inc. v Henry and Warren Corp., 74 NY2d 475, 548 [1989]) (Level 8 Defendants' Conclusions of Law at ¶ 316). The relevant factors here are: "(a) Mr. Lister was unsure who the parties to the contract were, i.e., whether it was entered into with Mr. Kim or Level 8, (b) there was no clear definition of the term "profits", (c) Mr. Lister could not pinpoint how net profits were to be calculated and when they would be paid, and most notable, (d) Mr. Lister could not pinpoint a definition of the agreement - i.e., Mr. Lister testified that his funding of Level 8 would last until such time as it would 'no longer be necessary'" (Level 8 Defendants' Conclusions of Law at ¶ 318).
The Level 8 Defendants also state that evidence at trial also demonstrated that Lister later agreed to reduce his 31% to 20% after Level 8 acquired the Haggar line (Level 8 Defendants' Conclusions of Law at ¶ 319). Moreover, since the type of arrangement Lister alleges cannot be [*55]performed within one year, it had to be in writing to be enforceable (Level 8 Defendants' Conclusions of Law at ¶ 321). Lister failed to adduce any evidence of the amount of damages arising from any purported breach (Level 8 Defendants' Conclusions of Law at ¶ 322).
The Court's Determination
The court finds and concludes that: Lister and Kim entered into an oral joint venture agreement which was terminable at will (see Foster v Kovner, 44 AD3d 23 [1st Dept 2007] ["[A]bsent any definite term of duration, an oral agreement to form a partnership or joint venture for an indefinite period creates a partnership or joint venture at will]); the agreement initially gave each of them a 31% interest in Level 8; that agreement was modified to 20%, effective January 2010, after Haggar was made a client of the business enterprise. The business relationship terminated when Samsung became factor in 2011, sometime after Lister ceased his involvement in Level 8 activities. Accordingly, the court finds and concludes that Lister is entitled to an award of 20% of profits for the year 2010 only.[FN11]
In this regard, profits from the year 2009 were, as noted above, awarded to Stuart's.
Lister presented no evidence of damages on his cross claims and instead relies on other evidence in the record, none of which the court can fully credit. Significantly, Plaintiffs' expert Fielstein relied on projected sales figures after 2009 (for Aeropostale) although there are actual sales figures, which are different than his projections. At the same time, Level 8's expert Kursh's profit projections are absurdly low. In addition, Lister has utterly failed to present evidence or analyze testimony and other evidence concerning Haggar sales, sufficient for the court to determine what profits should be attributable thereto. In short, making an award for Haggar profits under these circumstances would amount to sheer speculation.
The court computes the lost profits due to Lister based on 2010 profits attributable to Tumi and Aero, adopting the methodology of Fielstein, and the actual sales figures: 20% of Tumi profits on total sales of $5,851,670 in 2010 at the appropriate discount rate is $275,824.80 (20% of $1,379,124), and 20% of Aero profits on total sales of $2,310,302 in 2010 at the appropriate discount rate is $268,985.21 (3,310,302 x 8.3% = 274,755.07 x .979 = 268,985.21). The total amount of damages awarded in favor of Lister and against Level 8 and Sam Kim is $544,810.01, with interest from September 1, 2010 (see Exhibits 123 and DA).
Second Crossclaim Asserted by Worldwide Sourcing and Peter Lister Against Sam Kim and Level 8 As Successor to Stuart's LLC - Liable for all Obligations Owed by Stuart's
The Lister Defendants assert the following:
The evidence at trial shows that Level 8 is the successor in interest to Stuart's so that Level 8 is responsible for paying all of Stuart's debts, specifically the loan that WSG made to Stuart' with an open balance of $1,210,349.90. The evidence also showed that Peter Lister, Stuart Edelman and Michael Hong are entitled to share the profits of the successor business to Stuart's (Lister Defendants' Closing Argument at pp 23 -24).
The Level 8 Defendants argue the following in defense:
The Level 8 Defendants state that Lister did not "immediately believe Level 8 was truly the successor to Stuart's until he realized that he could use such a claim against Mr. Kim to pursue . . . his profit participation in Level 8. However, after his demands were not met, he then 'joined forces with Wayne Galvin on the issue'" (Level 8 Defendants' Conclusions of Law at ¶ 327).
They state that Lister's own actions, conduct and statements should be considered. citing to instances in which it appeared the Lister was "focused" on finding a successor company and he looked to Kim as the "only viable option" (Level 8 Defendants' Conclusions of Law at ¶¶ 327 - 329).
"[I]n view of Mr. Lister's 'unclean hands,' he should be equitably precluded from benefitting from such a finding." successor liability is an equitable claim and under the doctrine of unclean hands, relief may be denied in equity because of a litigant's own inequitable conduct (Extrin Foods v Leighton, 202 Misc 592 [Sup Ct Kings County 1952]) (Level 8 Defendants' Conclusions of Law at ¶¶ 324 , 330).
The Court's Determination
As noted above, the court finds and concludes that Level 8 is not the successor corporation to Stuart's. Accordingly, the claim is dismissed. Moreover, Lister's inconsistent positions  asserting that Level 8 was not a successor corporation in his pre-action dealings with Galvin, and his post-action assertion that it is a successor corporation are problematic in seeking equitable relief, as is his complicity in the wrongs done to Stuart's.
First Crossclaim Asserted by Level 8, World Cross Culture and Sam Kim Against Worldwide Sourcing and Peter Lister for Money Had and Received
The Level 8 Defendants assert the following:
Lister executed and entered into a written factoring agreement with Merchant Factors on behalf of, but without the knowledge or authorization of, Level 8 or Mr. or Ms. Kim. Lister executed and entered into the Merchant Factoring Agreement and other agreements purporting to be and act as "Managing Member" of Level 8. Lister was never (1) a managing member of Level 8, (2) authorized to served or act as Level 8's Managing Member; (3) authorized to enter into agreements as Managing Member of Level 8; and/or (4) authorized to otherwise act as Level 8's agent or representative. Instead, Lister: represented to Kim and Level 8 that he was arranging for [*56]a factoring facility for Level 8 through his company, WSG; never provided a copy of the Merchant Agreement or other documents to the Level 8 Defendants; intentionally and wilfully kept the terms of the Merchant Factoring Agreement and ancillary documents a secret.
The Merchant Agreement became effective April 15, 2009, yet it was early 2010 that the Level 8 Defendants became aware of its existence and thereafter, on March 19, 2010, Level 8 terminated the Agreement and entered into a new factoring agreement with a different factor (Level 8 Defendants Reply with Cross Claims to the Answer at ¶¶ 68 - 73).
The Level 8 Defendants state that Merchant Factors explicitly agreed to remit net payments to Level 8 on a weekly basis. However this was never done at any time. "Lister assigned * * * [d]iverted [f]unds to pay for debts and obligations Lister and/or WSG owed to Merchant Financial from transactions to which Level 8 was not a party and had no involvement." Any and all funds remitted "rightfully belonged to Level 8, pursuant to the Merchant Factoring Agreement." In March 2010, Level 8 demanded payment of the diverted funds from Lister and WSG, but they have "failed to, and refused to pay or return any of the Diverted Funds. "By reason of the foregoing, Level 8 is entitled to recover from Lister and WSGL the full amount of Diverted Funds, in an amount not less than $564,927.10, together with interest as provided by law" (Level 8 Defendants Reply to Cross Claims to the Answer at ¶¶ 74 - 83).
Second Crossclaim Asserted by Level 8, World Cross Culture and Sam Kim Against Worldwide Sourcing and Peter Lister for Conversion
Third Crossclaim Asserted by Level 8, World Cross Culture and Sam Kim Against Worldwide Sourcing and Peter Lister for Quantum Meruit
Fourth Crossclaim Asserted by Level 8, World Cross Culture and Sam Kim Against Worldwide Sourcing and Peter Lister for Accounting
The Court's Determination
All cross claims asserted by the Level 8 Defendants are without merit and are dismissed. The court does not credit the testimony of Missy Moon to the extent that she testified to sums allegedly owed by Lister to WSG. Moreover, the court finds that no monies are owed to the Level 8 Defendants.
In addition, to the extent not previously addressed, the counterclaim contained in Hong's answer, against Plaintiffs which seeks damages for bringing allegedly frivolous claims, is denied and dismissed. 
The Plaintiffs are directed to submit a proposed judgment within 60 days of the date hereof.
This constitutes the decision and order of the court after trial.
Dated: April 9, 2018
__________________________
Hon. Vito M. DeStefano, J.S.C.



Footnotes

Footnote 1:Galvin explained that a chargeback is from the retailer, Aeropostale, to the vendor that they are charging us back for noncompliance, such as, partial shipments, late delivery, or delivery to wrong locations.

Footnote 2:Galvin testified that these stores were all customers of Stuart's and he did not authorize anybody to call those stores and tell them not to contact him.

Footnote 3:Donna Fanara was the president of Corporate Marketplace and a customer of Stuart's.

Footnote 4:Laurence Franklin was the prior CEO and president of Tumi, Inc.

Footnote 5:Galvin under redirect stated that at this meeting Krantzler was not angry with him nor did he criticize him directly. When asked what caused him to write the apology letter, he said Edelman told him that Krantzler "was not happy with the line review meeting as related to me" (pp 634 - 635).

Footnote 6:Galvin answered that it was not his intent to have a meeting to discuss the immediate steps to commence an orderly shutdown.

Footnote 7:Later in redirect testimony, Galvin stated that, "it was a wrong word to use the word pressure emails. This was an effort to exert and leverage the negotiations for me to step aside" (p 625).

Footnote 8:Spiegel was Edelman's "lifelong friend" who agreed to be a member because "I had a judgment against me and I didn't want to have my ownership of any other business." (P 930).
Footnote 9:In early 2010, the relationship between Level 8 and its factor (Merchant Factors) terminated. The above-referenced minutes were prepared in connection with the transition from Merchant Factors to Sterling Factors. Moon further testified that Kim asked her to be the president of Level 8 until 2011 when Samsung became the new finance partner (pp 1836 - 1839).
Footnote 10:Kim acknowledged that Aeropostale was Stuart's customer.

Footnote 11:Defendant Lister also moves to conform the pleadings to the proof and requests that the Court issue a declaratory judgment that the profit participation allocation for the defendants in Level 8 be declared as follows: Lister 31%, Edelman 31%, Kim 31% and Hong 7%. Interestingly, no declaratory relief was sought by Lister in his pleadings. Moreover, neither Edelman nor Hong seek declaratory relief; in his post-trial submissions, the latter denies having any interest in Level 8. The court has conformed the pleadings to the proof and grants only the relief indicated on the causes of action as indicated above.